[884 NE2d 1019, 855 NYS2d 20]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL RAWLINS, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DWAIN MEEKINS, Appellant.

Argued January 3, 2008; decided February 19, 2008

## POINTS OF COUNSEL

*Legal Aid Society Criminal Appeals Bureau,* New York City (*Amy Donner* and *Steven Banks* of counsel), for appellant in the first above-entitled action. I. The introduction of fingerprint record reports containing the findings of a latent fingerprint examiner who did not testify violated appellant's right to confront the witnesses against him and to his due process right to fair trial because (a) two of the reports were prepared by a nontestifying expert and constituted testimonial hearsay and (b) four of the fingerprint reports failed to qualify as business records because the prosecution failed to establish that they were prepared contemporaneously with the analyses. (*Davis v Washington,* 547 US 813; *Crawford v Washington,* 541 US 36; *People v Goldstein,* 6 NY3d 119; *Pointer v Texas,* 380 US 400; *Ohio v Roberts,* 448 US 56; *People v Pacer,* 6 NY3d 504; *United States v Bahena-Cardenas,* 411 F3d 1067; *People v Hernandez,* 7 Misc 3d 568; *People v Rogers,* 8 AD3d 888; *People v Williams,* 30 AD3d 980.) II. Appellant's conviction of the burglary of Jerome Florist violates due process because evidence linking appellant to the burglary is legally insufficient where it is based only on the recovery of his fingerprint on a piece of broken glass from a

windowpane in the store's door which the People's fingerprint expert admitted could have been on the outside of the store and could have been placed on the glass a year before the burglary. (*People v Wong,* 81 NY2d 600; *People v Foster,* 64 NY2d 1144; *Jackson v Virginia,* 443 US 307; *People v Bleakley,* 69 NY2d 490; *People v Gates,* 24 NY2d 666; *People v Bullard,* 59 AD2d 786; *People v DiBlasi,* 130 AD2d 679; *People v McDowell,* 255 AD2d 976; *People v Pena,* 99 AD2d 846; *People v Jacob,* 55 AD2d 961.) III. Appellant's maximum sentence of life imprisonment as a persistent felony offender violates his right to a jury trial and due process, because in order to impose that sentence, the court, rather than a jury, was required to determine facts in addition to and well beyond his prior convictions, and to do so by mere preponderance of the evidence. (*People v Rivera,* 5 NY3d 61; *Apprendi v New Jersey,* 530 US 466; *United States v Booker,* 543 US 220; *Ring v Arizona,* 536 US 584; *Blakely v Washington,* 542 US 296.)

*Robert M. Morgenthau, District Attorney,* New York City (*David M. Cohn* and *Mark Dwyer* of counsel), for respondent in the first above-entitled action. I. The trial evidence compellingly proved defendant's guilt. (*People v Schulz,* 4 NY3d 521; *People v Norman,* 85 NY2d 609; *Jackson v Virginia,* 443 US 307; *People v Santi,* 3 NY3d 234; *People v Williams,* 84 NY2d 925; *People v Yancey,* 24 NY2d 864; *People v Gates,* 24 NY2d 666; *People v Texeira,* 32 AD3d 756; *People v Vasquez,* 131 AD2d 523; *People v Riddick,* 130 AD2d 780.) II. The fingerprint reports prepared by Detectives Beatty and Laschke were properly admitted into evidence. (*People v Guidice,* 83 NY2d 630; *People v Kennedy,* 68 NY2d 569; *People v Cratsley,* 86 NY2d 81; *People v Grogan,* 28 AD3d 579; *People v Farrell,* 58 NY2d 637; *People v Taam,* 260 AD2d 261; *People v Fisher,* 201 AD2d 193; *Crawford v Washington,* 541 US 36; *Ohio v Roberts,* 448 US 56; *People v Pacer,* 6 NY3d 504.) III. Defendant's challenge to the constitutionality of the persistent felony offender sentencing scheme is meritless. (*Apprendi v New Jersey,* 530 US 466; *Almendarez-Torres v United States,* 523 US 224; *People v Rosen,* 96 NY2d 329; *United States v Booker,* 543 US 220; *Blakely v Washington,* 542 US 296; *Ring v Arizona,* 536 US 584; *People v Rivera,* 5 NY3d 61; *People v Daniels,* 5 NY3d 738.)

*David P. Greenberg,* New York City, and *Lynn W.L. Fahey* for appellant in the second above-entitled action. I. The court deprived appellant of his federal and state constitutional rights to due process and confrontation by allowing testimony and as-

sociated documentary proof about DNA data attributable to nontestifying witnesses. (*Crawford v Washington,* 541 US 36; *Davis v Washington,* 547 US 813; *People v Goldstein,* 6 NY3d 119; *People v Foster,* 27 NY2d 47; *Ohio v Roberts,* 448 US 56; *Diaz v United States,* 223 US 442; *United States v Wade,* 388 US 218; *California v Trombetta,* 467 US 479; *People v Pacer,* 6 NY3d 504; *People v Rogers,* 8 AD3d 888.) II. The prosecution failed to lay an adequate foundation for introduction of the rape kit DNA data as a business record. (*People v Kennedy,* 68 NY2d 569; *People v Cratsley,* 86 NY2d 81; *Standard Textile Co. v National Equip. Rental,* 80 AD2d 911.) III. Appellant was denied due process and a fair trial by the prosecutor's opening, trial evidence and corresponding summation commentary conveying that appellant's name and DNA profile were part of a database maintained by New York's criminal justice system and by the admission of hearsay testimony that the Medical Examiner's office learned of the alleged match between the rape kit and appellant's database profile from a letter sent to it by the Division of Criminal Justice Services. (*People v Resek,* 3 NY3d 385; *People v Mullin,* 41 NY2d 475; *People v Cook,* 42 NY2d 204; *People v Stanard,* 32 NY2d 143; *People v Nieves,* 67 NY2d 125; *People v Foster,* 27 NY2d 47.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Anthea H. Bruffee* and *Leonard Joblove* of counsel), for respondent in the second above-entitled action. I. Defendant failed to preserve for appellate review his claim that the People did not lay an adequate foundation for the admission of the Gene Screen file as a business record. Therefore, this Court is without jurisdiction to review this claim. In any event, the People laid an adequate foundation for the admission into evidence of both the Gene Screen and Office of the Chief Medical Examiner files as business records and any error in the admission of the Gene Screen file was harmless. (*People v Wright,* 34 AD3d 1274; *People v Marine,* 30 AD3d 268; *People v Bones,* 17 AD3d 689; *People v Miguel,* 53 NY2d 920; *People v Middleton,* 54 NY2d 42; *People v Kennedy,* 68 NY2d 569; *People v Cratsley,* 86 NY2d 81; *People ex rel. McGee v Walters,* 62 NY2d 317; *People v Grogan,* 28 AD3d 579; *People v Baylor,* 25 AD3d 562.) II. Defendant's right of confrontation and his right to due process were not violated by the admission into evidence of DNA test results because these lab files and reports were not testimonial and were properly admitted into evidence as business records. (*Pointer v Texas,* 380 US 400; *Crawford v Washington,* 541 US 36; *Mungo v Duncan,* 393 F3d 327, 544 US 1002; *People v Bradley,* 22 AD3d 33, 8

NY3d 124; *People v Coleman,* 16 AD3d 254; *People v Newland,* 6 AD3d 330; *People v Grogan,* 28 AD3d 579; *United States v Feliz,* 467 F3d 227; *People v Brown,* 9 Misc 3d 420, 31 AD3d 657; *People v Durio,* 7 Misc 3d 729.) III. Defendant's right to due process was not violated by the admission of evidence that defendant's DNA profile was in a computer database. Moreover, neither the evidence of the database and of the Division of Criminal Justice Services notification letter nor the prosecutor's comments about that evidence prejudiced defendant. (*People v Berg,* 59 NY2d 294; *People v Michael,* 48 NY2d 1; *People v Rice,* 75 NY2d 929; *People v Ortiz,* 54 NY2d 288; *People v Young,* 48 NY2d 995; *People v Medina,* 53 NY2d 951; *People v Tosca,* 98 NY2d 660; *People v Montanez,* 41 NY2d 53; *People v Claborn,* 35 AD3d 244; *People v Till,* 87 NY2d 835.)

## OPINION OF THE COURT

JONES, J.

These two appeals call upon us to resolve an issue of first impression for this Court: whether DNA and latent fingerprint comparison reports prepared by nontestifying experts are "testimonial" statements within the meaning of *Crawford v Washington* (541 US 36 [2004]).

### I.

*People v Rawlins*

Defendant Michael Rawlins was convicted, after a jury trial, of six counts of third-degree burglary relating to six commercial establishments in Manhattan. Defendant was sentenced, as a persistent felony offender, to concurrent terms of 15 years to life.

Defendant's arrest stems from a May 5, 2003 burglary of Fresh Cut Flowers, located in midtown Manhattan, at approximately 11:30 P.M. The arresting officer testified that he observed that the store's glass door was shattered, and that the cash register had been "tipped over on the floor," with coins and an ink roll from the cash register strewn about. Defendant had ink stains on his hands apparently from the ink roll. Further, a brick wrapped in a plastic bag was found on the ground near the shattered glass. A fingerprint officer lifted five latent prints from the register and placed them on a fingerprint card. Detective Arthur Connolly, a fingerprint examiner, subsequently

matched one of the latent prints with defendant's inked fingerprint card.[1]

Due to the similarities between the Fresh Cut burglary and four prior burglaries in Manhattan that took place between March and May of 2003, the task of examining latent prints recovered in those burglaries was reassigned to Detective Connolly approximately two weeks before he was to testify at defendant's trial. The facts of those other burglaries, in chronological order leading up to the Fresh Cut burglary, are as follows.

At approximately 1:15 A.M. on March 23, 2003, police officers responded to a break-in at West Side Stationers, an uptown Manhattan establishment. Like Fresh Cut, a portion of the glass door had been shattered, and either a brick or a rock was found on the floor, along with a plastic bag. Additionally, an opened cash register was on the floor, along with coins and other items; some cash was also missing. A latent fingerprint officer lifted 12 prints from the cash register and drawer. Detective Connolly determined a match between one of the latent prints and defendant's print.

Next, on April 15, 2003, at approximately 1:00 A.M., police officers responded to a break-in at Jerome Florist, an upper-East Side establishment. Again, similar to Fresh Cut and West Side, the lower half of a window to the right of the door was broken. Some coins were missing from the register. A latent fingerprint officer lifted four prints: three from pieces of glass on the floor and one from the door next to the broken window pane. Connolly ultimately determined that a latent print from a piece of glass matched defendant's right thumb print.

At approximately 8:45 A.M. on the same day, officers responded to a break-in at Andreas Hair Stylists, another upper-East Side establishment. The lower part of the glass door had been broken and some cash and styling tools were taken. A latent fingerprint officer lifted one print from the bottom of the coin drawer of the cash register. Detective Connolly subsequently determined a match with defendant's print.

---

1. According to Connolly, a "latent" fingerprint is, essentially, "a chance [fingerprint] impression" transferred onto a smooth surface through the aid of one's sweat or other substance that can transfer the ridged contours of a fingerprint. By contrast, a "patent" fingerprint is one deliberately taken and transferred on a white card with the aid of black ink. Whereas a patent fingerprint image is a complete print, a latent print's completeness, and therefore usefulness, may vary depending on the strength of the unintended impression.

The last burglary before Fresh Cut Flowers, which actually involved two separate but connected establishments—Sophia's Bistro and the Soha bar—took place at approximately 8:20 A.M. on April 29, 2003. Immediately before any breaking-and-entering had occurred, a nearby street cleaner observed defendant sitting in front of Sophia's with a sweater and a brick. Minutes later, he heard glass shatter and then noticed that defendant was inside Sophia's. The witness then alerted his supervisor, who notified the police. Shortly after entering Sophia's, defendant left Soha.[2] Both the street cleaner and his supervisor saw defendant exit Soha, while the latter gave an unfruitful chase. The responding officers observed the bottom part of a window adjacent to the door shattered, along with a sweater and a brick that went through the window. A latent fingerprint officer lifted 15 prints from glass on the floor in Sophia's, as well as one from a cash register drawer in Soha. Ultimately, Connolly concluded that the register print found in Soha and one lifted from shattered glass in Sophia's matched defendant's print.

Before reassignment to Connolly, Detective Artis Beatty (who did not testify) had prepared two latent fingerprint comparison reports (Jerome Florist and Andreas Hair Stylists). Additionally, Detective Eric Laschke, who testified as a defense witness, prepared two similar reports for the West Side, Sophia's and Soha burglaries. All four reports by Beatty and Laschke were admitted as business records. Connolly testified that in each case, he independently compared the latent prints with defendant's fingerprint card and determined a match with "one hundred percent certainty," and thus agreed with Beatty's and Laschke's prior conclusions. Because Laschke testified at trial, however, defendant limited his *Crawford* challenge to the admission of Beatty's reports, and also challenged the admission of all four reports on the ground that the People failed to establish the contemporaneity requirement of the business records exception.

Following the jury verdict, Supreme Court denied defendant's motion to set aside, for insufficiency, the conviction as to Je-

---

**2.** Sophia's owner also owns the adjacent Soha bar, and the two establishments, although with separate front entrances, are connected by an internal door for staff to serve both facilities without having to go outside. Because they were separately run establishments with separate entrances and addresses, defendant was charged with two burglary counts. The latent prints for both were, however, evaluated in a single report.

rome Florist.[3] The People subsequently moved for a persistent felony offender sentencing adjudication pursuant to Penal Law § 70.10 and CPL 400.20. Over defendant's *Apprendi v New Jersey* (530 US 466 [2000]) objection—that the sentence enhancement statutes require judicial fact-finding beyond the fact of prior convictions—Supreme Court adjudicated defendant a persistent felony offender.

The Appellate Division affirmed (*see People v Rawlins*, 37 AD3d 183 [2007]). The court rejected defendant's *Crawford* challenge, holding that although Beatty did not testify, his "reports qualified as nontestimonial business records . . . [because they] were not prepared for the specific purpose of litigation" (*id.* at 184). Even if testimonial, the court deemed their admission harmless and "merely duplicative" because Detective Connolly, who *was* subject to cross-examination, "made his own comparisons of the same fingerprints tested by [Beatty] and reached the same conclusions" (*id.*). The court also deemed the foundation for a business record established and rejected as meritless defendant's challenge relating to the sufficiency of the Jerome Florist count; finally, the court rejected defendant's *Apprendi* challenge, relying on *People v Rivera* (5 NY3d 61 [2005]).

### People v Meekins

Defendant Dwain Meekins was convicted, after a jury trial, of first-degree sodomy, first-degree sexual abuse and third-degree robbery, and sentenced accordingly.

At trial, the People introduced a report prepared by an independent private laboratory containing results of DNA testing conducted on samples taken from complainant's rape kit.[4] The report was introduced through the testimony of two experts in DNA analysis and forensic biology: Judith Floyd, employed by Gene Screen, the private laboratory, and Kyra Keblish, employed by the Office of the Chief Medical Examiner, neither of whom personally performed the actual testing.

Floyd testified that she supervised the technicians who performed the testing in this case and performed a final review of their results; that her duties involved ensuring that technicians followed established protocols; that, after vigorous and

---

**3.** Defendant's challenge concerned the lack of evidence establishing (1) when his latent print was placed on the glass and (2) on which side of the glass—store side or street side—the print was found.

**4.** The New York City Police Department (NYPD) contracted with, and sent to, independent private laboratories samples collected from crime scenes for DNA testing.

periodic inspections, those protocols have been deemed to conform to industry standards and that the lab is accredited by the Laboratory Accreditation Board of the American Society of Crime Laboratory Directors, the New York State Department of Health and the Texas Department of Public Safety. Floyd explained that the lab issued a statement in its report indicating that "a DNA profile originated from a male [that] was obtained from the sperm fraction of the oral swab" in the rape kit and that the lab "didn't do any comparisons of the results," but instead sent the report to the Medical Examiner's office for that task.[5]

Keblish testified that the Medical Examiner's office was, like Gene Screen, accredited by the Laboratory Accreditation Board of the American Society of Crime Laboratory Directors, as well as by New York State. Keblish testified that once the laboratory generated the "raw data" and sent its report to the Medical Examiner's office, her laboratory reviewed the file, "edit[ed] . . . the data"—or, interpreted the graphical data by "wean-[ing] out what peaks might not be DNA, because there are times that peaks will show up in the data that are not actually . . . DNA alleles or DNA peaks," distinguished complainant's DNA profile from the semen donor's DNA profile and then "up-loaded [the male DNA profile] into [a] database" of existing profiles for a possible match. Keblish added that her office was subsequently notified by letter from the Division of Criminal Justice Services that the "semen donor to the oral swab was the same DNA profile as Dwain Meekins." Subsequently, her office checked the case file it already had and made sure that the two DNA profiles were the same, and then contacted the District Attorney and the Police Department. Keblish, herself a qualified expert, gave her opinion that the DNA profiles from the rape kit were the same as defendant's. She also testified that this DNA match is found in "one in greater than a trillion" sample of donors.

---

**5.** Floyd explained in detail the process of testing a sample for DNA thus: A forensic examiner first "remove[s] DNA from the sample in question[, such as a blood stain or semen], then you subject it to [an] amplification procedure" called "polymerase chain reaction," or PCR, in which "certain strands of DNA" are "amplifi[ed]" to "allow[ ] us to have sufficient amounts of DNA . . . to evaluate and obtain a genetic profile." Floyd indicated that PCR is "widely used across the country in every laboratory." "[A]t the end of [the PCR] process . . . you then end up with possibly millions or billions of copies of DNA[, after which] . . . we would subject [the DNA] to . . . capillary electrophoresis, and then the forensically tagged pieces of DNA that [are] the result of that amplification are evaluated by the software and you come up with a specific genetic profile" for later comparison and evaluation.

Finally, Keblish testified that the DNA report and related files were "prepared in the regular course of business of the medical examiner's office and its contracted agencies"; that it was "the regular course of business for the medical examiner's office, as well as its contracted agencies, to make and keep such records"; that they were prepared "at or near the time the testing and the analysis [was] done"; and that "the persons [from both the lab and the Medical Examiner's office] preparing the information in the reports" were "under a business duty to do so truthfully and accurately." Keblish also testified that she was custodian of the combined records generated by the two entities. Over defendant's objection, Supreme Court admitted a consolidated file containing both labs' reports as business records of the Medical Examiner's office. The court also rejected defendant's hearsay objection to Keblish's testimony that she learned of a potential match from another agency.

The Appellate Division affirmed defendant's conviction (see *People v Meekins*, 34 AD3d 843 [2006]). The court determined that Keblish's testimony was sufficient to lay a foundation to admit the private laboratory's report as a business record; and that admission of the DNA report did not violate defendant's confrontation right "because business records are 'by their nature . . . not testimonial' " (*id.* at 845, quoting *Crawford*, 541 US at 56).

## II.

### A.

The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the *witnesses* against him" (emphasis added). Our State Constitution is to the same effect (see NY Const, art I, § 6). In *Crawford*, the Supreme Court explained that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure," particularly "its use of *ex parte* examinations as evidence *against the accused*" (541 US at 50 [emphasis added]). Thus, it applies to those who "bear testimony" (*id.* at 51). "Testimony" in turn "is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact' " (*id.*). The Court emphasized that the Confrontation Clause was concerned "with a specific type" of testimonial statement, which the Court explained by offering "[v]arious formulations":

"[1] *'ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,'* . . . [2] *'extrajudicial statements . . . contained in formalized testimonial materials*, such as affidavits, depositions, prior testimony, or confessions,'* . . . [and 3] *'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'* " (*id.* at 51-52 [emphasis added and citations omitted]).[6]

The "common nucleus" (*id.* at 52) of these formulations is generally described as *ex parte accusatory* statements.

"Despite the lack of a precise definition," the Court offered "additional clues" for determining the testimoniality of a statement (2 Wharton's Criminal Evidence § 6:10 [15th ed]). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not" (*Crawford,* 541 US at 51). "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse" (*id.* at 56 n 7; *see also Lilly v Virginia,* 527 US 116, 137 [1999] ["when the government is involved in the statements' production, and when the statements describe past events," they "implicate the core concerns of the old *ex parte* affidavit practice"]; 2 McCormick on Evidence § 252, at 158 [6th ed 2006] ["These inquisitorial practices and their modern analogs are the focus of *Crawford*"]).

In *Davis v Washington* (547 US 813 [2006]), the Court elaborated on *Crawford,* but ushered in no new law. Its contribution, useful for evaluating the confrontation question, was in its application and its resounding emphasis that context matters for Confrontation Clause purposes. As *Davis* showed, determining the question whether evidence was improperly admitted requires a fact-intensive inquiry under the circumstances of each case.

---

**6.** The Court, however, deemed it unnecessary to endorse any of them because the statements in question "qualifie[d] under any definition" (541 US at 52).

In *Davis*, the Court held that in the context of police interrogations,

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" (547 US at 822).

*Davis* reiterated that the Confrontation Clause is concerned with the "weaker" but functional "substitute for" live testimony (i.e., *ex parte accusatory* statements) (*id.* at 828).

*Davis*'s "primary purpose" test thus reflects the important distinction between a statement (generated through police interrogation or otherwise) that "accuses" a perpetrator of a crime—i.e., to "do precisely *what a witness does* on direct examination" (*id.* at 830)—versus one that serves some other nontestimonial purpose (i.e., to meet an ongoing emergency): the former is accusatory since its "purpose . . . [is] to nail down the truth about past criminal events" (*id.*), while the latter is not. Emphasizing the critical purpose that produced the varying statements in *Davis, Hammon v Indiana* (*Davis*'s companion case) and *Crawford*, Justice Scalia aptly observed that "[n]o 'witness' goes into court to proclaim an emergency and seek help" (*id.* at 828). The lodestar, then, that emerges from *Davis* is the *purpose* that the statement was intended to serve. In the context of police interrogations, that purpose is gleaned, in part, from whether the goal in obtaining responses was to meet an ongoing emergency, or to gather evidence for purely investigatory reasons (*see People v Nieves-Andino*, 9 NY3d 12, 15 [2007] [officer's "primary purpose" in questioning victim was to "prevent( ) further harm," not to gather facts of crime]; *People v Bradley*, 8 NY3d 124, 128 [2006]; *People v Pacer*, 6 NY3d 504, 510 [2006]; *People v Goldstein*, 6 NY3d 119, 123-124, 129 [2005], *cert denied* 547 US 1159 [2006]).

Relatedly, it bears noting that *Davis*'s concern for government involvement is not absolute. The Court's test, on its face and in its application, properly reflects the view that not all government involvement inevitably leads to the forbidden

testimonial fruit.[7] As Justice Scalia noted, we should look objectively to law enforcement's conduct in the course of an interrogation, as well as declarant's statements, to inform us whether a response is testimonial (547 US at 822-823 n1), as "not all hearsay implicates the Sixth Amendment's core concerns" (*Crawford*, 541 US at 51 [government involvement as posing "unique *potential*" for prosecutorial abuse (*id.* at 56 n 7 [emphasis added])]).

## B.

The People in both appeals before us ask us to adopt an absolute rule, discussed in *Crawford*, that all business records "by their nature [are] not testimonial" (*Crawford*, 541 US at 56).[8] Under our rules of evidence, however—unlike the federal rules (*see* Fed Rules Evid rule 803 [6], [8])—"law enforcement agencies constitute businesses for purposes of the rule" (*People v Guidice*, 83 NY2d 630, 635 [1994] [citation and internal quotation marks omitted]).[9] Accordingly, a bright line rule could run afoul of either our Federal or State Constitutions, and most es-

---

**7.** "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance" (*Davis*, 547 US at 827).

**8.** Some courts have reached that conclusion. (*See e.g. People v Grogan*, 28 AD3d 579, 581 [2d Dept 2006], *lv denied* 7 NY3d 789 [2006] [DNA reports were business records, which are "by their nature . . . not testimonial"]; *People v Brown*, 9 Misc 3d 420 [Sup Ct, Queens County 2005]; *People v Durio*, 7 Misc 3d 729, 734 [2005] ["(u)nder *Crawford* business records are specifically exempted from challenge because they are outside the 'core testimonial statements that the Confrontation Clause plainly meant to exclude' " (citation omitted)]; *United States v Feliz*, 467 F3d 227, 233-234 [2d Cir 2006], *cert denied sub nom. Erbo v United States*, 549 US —, 127 S Ct 1323 [2007] [business records "cannot be testimonial because (they are) fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence"]; *State v Forte*, 360 NC 427, 629 SE2d 137 [2006], *cert denied* 549 US —, 127 S Ct 557 [2006]; *State v Norman*, 203 Or App 1, 125 P3d 15 [2005].)

**9.** CPLR 4518 (a), New York's business records exception to the hearsay prohibition, provides:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of that act, transaction, occurrence or event, if the judge finds that it was made in the regular course of any business and that it was the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter."

pecially in certain types of police business records.[10] It is true that the "essence" of the exception is that " 'records systematically made for the conduct of a business . . . are inherently highly trustworthy because they are routine reflections of day-to-day operations and because the entrant's obligation is to have them truthful and accurate for purposes of the conduct of the enterprise' " (83 NY2d at 635, quoting *People v Kennedy*, 68 NY2d 569, 579 [1986]).

■ However, we hasten to warn against the convenient danger of relying on a hearsay exception—particularly business records, and the breadth of that exception in New York—as a proxy for the statement's reliability when the real inquiry concerns whether a statement is "testimonial" as that term is now understood after *Crawford* and *Davis*. Indeed, the Supreme Court explicitly rejected as unfaithful to the original meaning of the Confrontation Clause its prior test in *Ohio v Roberts* (448 US 56 [1980]), which admitted out-of-court statements "so long as [they had] adequate indicia of reliability—*i.e.*, [fell] within a 'firmly rooted hearsay exception' " (*Crawford*, 541 US at 42, quoting *Roberts*, 448 US at 66). In no uncertain terms, the Court noted that the constitutional concerns do "not evaporate when testimony happens to fall within some broad, modern hearsay exception" (*id.* at 56 n 7).[11] Thus, in each case, we must view the statement through a multifaceted prism that properly

---

**10.** *See Thomas v United States*, 914 A2d 1, 13 (DC Ct App 2006), *cert denied* 552 US —, 128 S Ct 241 (2007) (viewing categorical exemption of business records as a "fundamental[ ] misread[ing]" of *Crawford*); *People v Mitchell*, 131 Cal App 4th 1210, 1222, 32 Cal Rptr 3d 613, 621 (2005) (by *Crawford*'s reference to hearsay exceptions, "Court could not have meant all documentary evidence which could broadly qualify in some context as a business record should automatically be considered non-testimonial").

**11.** Historically,

> "the [business records] exception in 1791 was a very narrow one. In *Crawford*, the Supreme Court found no evidence that the historical business records exception (or any other historical exception apart from that for dying declarations) ever had been 'invoked to admit *testimonial* statements against the accused in a *criminal* case,' nor any indication that the Framers thought it could be so used" (*Thomas*, 914 A2d at 13 [citation omitted]).

Our concurring colleague (*see* concurring op at 161) would have it otherwise, *Crawford*'s plain discussion of history to the contrary. While we agree that *generally*, business records are not testimonial, that is so not because they are business records, without more, but rather because their authors are not in the business of producing a statement that bears a "striking resemblance" (*Crawford*, 541 US at 52) to "*what a witness does* on direct examination" (*Davis*, 547 US at 830). Certainly this much cannot be said of *all* modern-day business records, especially all police business records.

reflects the "core" evil the Confrontation Clause was designed to prevent: "the civil-law mode of criminal procedure" and its insidious "use of *ex parte* examinations as evidence against the accused" (*Crawford*, 541 US at 50). In short, our task in each case must be to evaluate whether a statement is properly viewed as a surrogate for accusatory in-court testimony.

In a similar vein, we reject the attempt to reduce the inquiry to other expedient bright line tests. Thus, we decline to adopt the approach by other courts to hinge our determination on the expectation that a statement will be available at trial (*see e.g. State v Renshaw*, 390 NJ Super 456, 915 A2d 1081 [App Div 2007] [blood sample certification]; *State v Caulfield*, 722 NW2d 304 [Minn 2006] [report identifying substance as cocaine]). Critically, although *Crawford* identified as one of several formulations whether "an objective witness reasonably [believed] that the statement would be available for use at a later trial" (541 US at 52), the Court endorsed none of them. "Following *Davis*, 'it cannot be that a statement is testimonial in every case where a declarant reasonably expects that it might be used prosecutorially' " (*State v O'Maley*, 156 NH 125, 135, 932 A2d 1, 10 [2007], quoting *United States v Ellis*, 460 F3d 920, 926 [7th Cir 2006]; *see also People v Geier*, 41 Cal 4th 555, 607, 161 P3d 104, 140 [2007] ["*Davis* confirms that the critical inquiry is not whether it might be reasonably anticipated that a statement will be used at trial," though one factor to consider, "but the circumstances under which the statement was made"]).

The flaw in that singular test, urged by defendants in the appeals before us, is that it, like the so-called business records exception to the Sixth Amendment, is too broad.[12] *Davis* reminds us that the inquiry is an objective one under the circumstances, an approach that necessarily must account for various indicia of testimoniality beyond the declarant's reasonable expectations (*see Davis*, 547 US at 826-829). In *Davis*, for example, Michelle McCottry told the police: "He's here jumpin' on me again"; "He's usin' his fists"; later in complainant's colloquy with the 911 operator, she identified defendant by his full name (*id.* at 817). Clearly, she could well have expected her statements to be used against defendant later at trial. However, viewing the cir-

---

**12.** *See* 2 McCormick on Evidence § 252, at 162 (test "is the most general and abstract" of *Crawford*'s three formulations, "provides the opportunity for the broadest application and is the most indeterminate").

cumstances objectively, her responses to questioning—though prejudicial—were not accusatory (in a Sixth Amendment sense) as they served the primary purpose of aiding the police in an ongoing emergency, not to implicate defendant. In other words, her statements were not the "courtroom analogues" (*id.* at 828) that the Clause was designed to protect against. In short, Mc-Cottry neither "testified" nor bore "witness" against defendant.

The foregoing observations are important reminders, especially when it requires courts to apply *Crawford*'s seemingly innocuous "formulations" to new, complex situations. As the Court in *Crawford* noted, the Clause "applies to '*witnesses*' against the accused" and reflects an "acute concern [for a] specific type of out-of-court statement" (541 US at 51 [emphasis added]).

## C.

In the context of scientific tests, such as DNA analysis, many state and federal courts have considered the question presented, and little consensus has emerged (*see e.g. People v Freycinet*, 41 AD3d 731, 731 [2d Dept 2007], *lv granted* 9 NY3d 922 [2007] [dissecting "non-opinion portion" of autopsy report, holding it was "nontestimonial in nature" and admissible as business record]; *People v Rogers*, 8 AD3d 888, 891 [3d Dept 2004] [results of blood testing were testimonial where "test was initiated by the prosecution and generated by a desire to discover evidence against defendant"]; *United States v Feliz*, 467 F3d 227, 233-234 [2d Cir 2006], *cert denied sub nom. Erbo v United States*, 549 US —, 127 S Ct 1323 [2007] [autopsy report nontestimonial "because a business record is fundamentally inconsistent with what the Supreme Court has suggested (in *Crawford* and *Davis*) comprise the defining characteristics of testimonial evidence"]; *United States v Ellis*, 460 F3d 920, 927 [7th Cir 2006] [medical records revealing methamphetamine in defendant's system nontestimonial business records as the medical professionals involved in testing, "like the declarant reporting an emergency in *Davis*—were not acting as . . . witness(es) and were not testifying" (internal quotation marks and emphasis omitted)]; *Sobota v State*, 933 So 2d 1277 [Fla Dist Ct App 2006] [blood sample report tested at state laboratory testimonial]; *Neal v State*, 281 Ga App 261, 635 SE2d 864 [2006] [breathalyzer machine inspection certificates nontestimonial]; *State v Caulfield*, 722 NW2d 304, 309 [Minn 2006] [lab report identifying

substance as cocaine testimonial because "lab analyst . . . attested to her findings," report was functional "equivalent of testimony" in identifying substance and report was prepared at behest of police for prosecution to prove element of charged crimes]; *Thomas v United States*, 914 A2d 1, 9 [DC App 2006] [Drug Enforcement Administration chemist's report testimonial]).

Nevertheless, we find some of the insights and reasoning by other courts instructive. In *State v Crager* (116 Ohio St 3d 369, 879 NE2d 745 [2007]), the Supreme Court of Ohio concluded that a report of DNA testing conducted by a government agency at the request of the state was nontestimonial. The court reasoned that "[a]lthough [the state laboratory's] statutory mission . . . is to 'aid' law enforcement in solving crimes, [it] is not itself an 'arm' of law enforcement in the sense that the word implies a specific purpose to obtain incriminating results" (116 Ohio St 3d at 379, 879 NE2d at 753); instead, the laboratory "maintains its independence to objectively test and analyze the samples it receives" (116 Ohio St 3d at 379, 879 NE2d at 754). Additionally, although the laboratory technicians could have reasonably expected that the DNA reports would be used in a later prosecution, the concern that declarants' "statement" (the various lab technicians' notes made throughout the testing steps and result) could be prejudicial is allayed (in a *Davis* sense) because such notes "represented the contemporaneous recordation" of the test results "as [they were] actually performing those tasks" pursuant to industry-accredited protocols (116 Ohio St 3d at 382, 879 NE2d at 756).

The Supreme Court of Ohio is not alone in its reasoning, and *Crawford* and *Davis*, as we noted earlier, strongly suggest that *Crager* makes viable distinctions. A salient characteristic of objective, highly scientific testing like DNA analysis is that the results are not inherently biased toward inculpating the defendant; they can also exculpate. The inescapable corollary is that police or prosecutorial involvement is unlikely to have any impact on the test's results. Thus, in *Davis* terms, police or prosecutorial involvement in a case like *Crager* becomes a nonissue, and the focus shifts to declarant (*see Davis*, 547 US at 826-827). The force of *Davis* is that context matters; we look not only to the interrogator's primary purpose in questioning, but also, in declarant's view, to the purpose the statement was intended to serve, and to the motivation for the statement (*see id*. at 828 [McCottry was "not acting as a *witness*" and thus

"was not *testifying*" when speaking to police; instead, her statements aided them in an ongoing emergency]). The critical points from *Crager*, then, are that a lab technician ordinarily has no subjective interest in the test's outcome, and could hardly affect the result in any event; the analyst was simply recording, contemporaneously, the administration of scientific protocol to reveal what is hidden from the naked eye.

In *Commonwealth v Verde* (444 Mass 279, 827 NE2d 701 [2005]), the Supreme Judicial Court of Massachusetts similarly held that certificates of chemical analysis identifying as cocaine a substance seized from defendant were nontestimonial. Although the court observed that the record fell "within the public records exception to the confrontation clause," the court properly focused on the "nature" of the report, and whether it bore any semblance of substituted live testimony (444 Mass at 284, 827 NE2d at 705). The "[c]ertificates of chemical analysis," in the court's view, were "neither discretionary nor based on opinion"; they did not concern the exercise of fallible human judgment over questions of cause and effect; instead, "they merely [recorded, contemporaneously, the procedures taken and] state[d] the results of a well-recognized scientific test determining the composition and quantity of the substance" (444 Mass at 283, 827 NE2d at 705; *see also Brown*, 9 Misc 3d at 424 ["The notes and records of the laboratory technicians who tested the DNA samples . . . were not made for investigative or prosecutorial purposes but rather were made for the routine purpose of ensuring the accuracy of the testing done in the laboratory and as a foundation for formulating the DNA profile"]; *cf. State v March*, 216 SW3d 663 [Mo 2007] [drug chemical analysis report prepared solely for prosecution testimonial]). The certificate had "very little kinship to the type of hearsay the confrontation clause intended to exclude" (*Verde*, 444 Mass at 284, 827 NE2d at 706). In short, as in *Crager*, the contemporaneous recordation of scientific protocol must be undertaken independent of any possible use at trial, for the independent purpose of ensuring that the test was properly administered (*see Davis*, 547 US at 826-827).

The necessary import of *Crager*'s and *Verde*'s reasoning is that cross-examination of the technicians who performed the actual testing would have borne no more information than what an authentication challenge may have revealed (i.e., what they recorded). As the *Verde* court noted, "defendant was free to rebut the information in the certificate" and in fact did so, and

"the jury [was] free to credit [defendant's expert's] testimony and to discredit the certificate of analysis as [it] saw fit" (444 Mass at 284, 285, 827 NE2d at 706).[13]

In a detailed opinion, the Supreme Court of California in *Geier* (41 Cal 4th 555, 161 P3d 104 [2007]) also confronted this precise issue in the context of DNA testing. In *Geier*, the prosecution relied on an expert in forensic biology and biochemistry employed by a private lab that conducted DNA testing on a rape kit. The expert supervised the actual technicians who conducted the testing. She testified at trial that, based upon the DNA test results, defendant's DNA profile matched a profile extracted from a victim. Defendant's principal *Crawford* objection was that the expert did not conduct the testing herself. The court determined, based on its interpretation of *Crawford* and *Davis*, that in the context of DNA analysis, "a statement is testimonial if (1) it is made to a law enforcement officer or by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial" (*Geier*, 41 Cal 4th at 605, 161 P3d at 138-139). As to each criterion, the court reasoned: (1) only government involvement focused on " 'the production of testimonial evidence' " implicates the Confrontation Clause (41 Cal 4th at 605, 161 P3d at 139, quoting *Crawford*, 541 US at 53); (2) although the private laboratory was acting on behalf of a police agency, and although the technician could reasonably expect her report to be available for future prosecution, her

> "observations . . . constitute a contemporaneous recordation of observable events rather than the documentation of past events. That is, she recorded her observations regarding the receipt of the DNA samples, her preparation of the samples for analysis, and the results of that analysis as she was actually performing those tasks. 'Therefore, when [she] made these observations, [she]—like the declarant

---

13. By this observation the court does not appear to suggest, nor do we, that the ability to challenge the state's expert by such means precludes a finding of testimoniality; it merely observes that were the actual analysts who participated in the testing to testify, they would likely do no more than read from their own recordings of steps they took and how they took them, and what adjustments, if any, were made. This suggests that the highly verifiable nature of certain scientific testing, like DNA, obviates the need to call the actual, often numerous analysts who took part in testing.

reporting an emergency in *Davis*—[was] "not acting as [a] witness[ ];" and [was] "not testifying" ' " (41 Cal 4th at 605-606, 161 P3d at 139, quoting *Ellis*, 460 F3d at 926-927).

The court noted that the analyst who generated the report did so for the purpose of adhering to "standardized scientific protocol," "not . . . to incriminate [the] defendant" (41 Cal 4th at 607, 161 P3d at 140). In short, the neutral testing procedures and the resulting raw data were not "accusatory" (again, in a Sixth Amendment sense) and the analyst did not "bear witness" against defendant (*id.*). Therefore, according to the court, "it cannot be that a statement is testimonial in every case where a declarant reasonably expects that [his/her] statement might be used prosecutorially," for Michelle McCottry in *Davis*, though she reasonably expected her statements to lead to an arrest and prosecution, was certainly not "testifying" as *Davis* explained that term (41 Cal 4th at 605, 606, 161 P3d at 139). We agree with *Geier*'s rationale.

While it is noteworthy that *Crager*, *Verde* and *Geier* all emphasized the objectivity of the scientific procedures at issue, it is also relevant that, at least in *Verde* and *Geier* (and, as far as we can tell from the opinion, in *Crager*), the declarants' out-of-court statements were not directly accusatory, in the sense that they explicitly linked the defendants to the crimes. The contrast is particularly noticeable in *Geier*: while the laboratory analysis was performed by technicians who did not testify, the comparison to defendant's DNA was made by a testifying witness. The distinction, like the others we have discussed, is not an infallible touchstone; undoubtedly, statements can often be testimonial where their tendency to inculpate the defendant is only indirect. In close cases, however, the directness with which a particular statement points to the defendant as the offender is a factor to be considered.

As the preceding discussion shows, facts and context are essential. The question of testimoniality requires consideration of multiple factors, not all of equal import in every case. And while it is impossible to provide an exhaustive list of factors that may enter into the mix, two play an especially important role in this determination: first, whether the statement was prepared in a manner resembling ex parte examination and second, whether the statement accuses defendant of criminal wrongdoing. The purpose of making or generating the statement, and the declarant's motive for doing so, inform these two interrelated touchstones.

## III.

### *People v Rawlins*

■ Defendant argues that the fingerprint reports at issue were clearly testimonial because Beatty, a police detective, prepared his reports solely for prosecutorial purposes and, most importantly, because they were accusatory and offered to establish defendant's identity. We agree that Beatty's reports were testimonial, but nonetheless conclude that their admission was harmless beyond a reasonable doubt.

Beatty's fingerprint reports, inherently accusatory and offered to prove an essential element of the crimes charged, could be nothing but testimonial. Latent fingerprint reports—which compare unknown latent prints from the crime with fingerprints from a known individual—fit the classic definition of "a weaker substitute for live testimony" at trial (*Davis*, 547 US at 828). In effect, Beatty was "testifying" through his reports that, in his opinion, defendant is the same person who committed the burglaries; had Beatty witnessed defendant committing the burglaries, he would have testified in like fashion. Critically, the purpose of gathering evidence of a past crime, i.e., latent prints, and comparing them with known prints—an admittedly inexact science—was to ultimately apprehend a perpetrator, and Beatty had no other expectation in making his comparisons, nor in rendering an arguably controvertible opinion (*see Pacer*, 6 NY3d at 512; *Goldstein*, 6 NY3d at 129).[14]

Nevertheless, admission of Beatty's reports was harmless error beyond a reasonable doubt (*see Goldstein*, 6 NY3d at 129). As the Appellate Division concluded, Beatty's reports for Jerome Florist and Andreas Hair Stylists were cumulative, as the expert who did testify (Connolly) reached that same conclusion after comparing the latent prints from those two establishments. Further, we reject defendant's related contention that admission of Beatty's reports unduly prejudiced him in light of

---

14. Respectfully, we disagree with our concurring colleague that Beatty's reports were nontestimonial because they are business records and, thus, were not made " 'to nail down the truth about past criminal events' " (concurring op at 161). Manifestly they were; it was the business of Detective Beatty to establish (if possible) who committed the crime. His reports are no less testimonial because the task of comparing latent fingerprints with a candidate's is in the "nature" of what police officers do in the ordinary course of business. It is true that Beatty's conclusions could well have exculpated Rawlins from the NYPD's short list of suspects; the point, however, is that direct law enforcement involvement "presents unique *potential*" for abuse (*Crawford*, 541 US at 57 n 6 [emphasis added]).

Connolly's testimony. Defendant cross-examined Connolly as to his fingerprint methodology and assessment of matching point values; it is true, as defendant argues, that different experts may disagree "as to whether there is a sufficient number and quality of points of identity" necessary to render an opinion on a comparison. Here, however, where the jury heard defendant's questioning of Connolly and Laschke, we are satisfied beyond a reasonable doubt that Beatty's improperly admitted reports did not influence the outcome.

■ Finally, we reject as meritless defendant's challenge to the constitutionality of New York's persistent felony offender sentencing scheme (*see* Penal Law § 70.10; CPL 400.20 [1]; *see also People v Rivera*, 5 NY3d 61 [2005], *cert denied* 546 US 984 [2005]; *People v Rosen*, 96 NY2d 329 [2001], *cert denied* 534 US 899 [2001]). Defendant's remaining contentions are unavailing.

*People v Meekins*

Pointing to certain indicia bearing on the question of testimoniality, defendant argues that the data Gene Screen generated and the other materials in the Medical Examiner's file are testimonial because the technicians who conducted the testing knew that they were working on a rape kit and, thus, had every reason to expect that their results would potentially be used to prosecute the individual ultimately identified. He also notes that the NYPD outsourced the task of testing crime scene samples for DNA to Gene Screen. Defendant argues that "the only conceivable purpose of collecting and memorializing the [testing] data was to establish the identity of a suspect." He contends that "[t]he DNA data . . . constituted a set of statements attributable to the lab technicians expressing the results of the scientific process they had performed," and that "[n]either [Floyd nor Keblish] had any direct role" in the procedures employed.

■ The People, on the other hand, argue that the data and report prepared by Gene Screen is not the "functional equivalent" of the type of statements historically condemned by the Confrontation Clause. Instead, they argue, Gene Screen's report is a business record, which is "by [its] nature" (*Crawford*, 541 US at 56) nontestimonial. We agree that, under the circumstances of this case, the DNA data generated by Gene Screen is not testimonial.

As the record plainly indicates, and as Floyd (the Gene Screen supervisor) testified, the report in question contained raw data

in the form of "a DNA profile [that] originated from a male . . . obtained from the sperm fraction of the oral swab" from the rape kit. Specifically, the raw data was in the form of nonidentifying graphical information. Defendant challenges this data and statement as a substitute for live testimony, but concedes, critically, that Gene Screen "did not determine whether the data it collected matched [defendant] or any other suspect." Indeed, as Floyd explained, Gene Screen "didn't do any comparisons of the results" to any known DNA profiles. The graphical DNA test results, standing alone, shed no light on the guilt of the accused in the absence of an expert's opinion that the results genetically match a known sample. That, however, was the Medical Examiner's role, which defendant does not challenge. Indeed, even after the Medical Examiner's office received notice from the Division of Criminal Justice Services of a possible match between the semen donor and a DNA profile preexisting in a database, Keblish's office "checked the case file that [it] had already and made sure that the two DNA profiles were the same," and only then did it notify the District Attorney and the Police Department.

Gene Screen's report, a product of multiple analysts, is not the kind of ex parte testimony the Confrontation Clause was designed to protect against. Like the certificates of chemical analysis at issue in *Verde*, the testing and procedures employed in this case were "neither discretionary nor based on opinion" (444 Mass at 283, 827 NE2d at 705); nor did they concern the exercise of fallible human judgment over questions of cause and effect. This is not to say that errors could not have been made in the testing *procedure* itself. But those errors, if any, are not the product of "testimony" as we understand that term. Because the Gene Screen technicians only contemporaneously recorded the procedures employed and "state[d] the results of a well-recognized scientific test" (*id.*)—for the purpose, we note, of permitting subsequent reviewers to verify their work—a supervising witness under oath familiar with the laboratory's requirements pursuant to rigid accreditation could illuminate on cross-examination whether protocol was followed.

Further, it is of no moment that the Gene Screen technicians knew or had every reason to know (because they were working on a rape kit) that their findings could generate results that could later be used at trial, nor that Gene Screen was performing work for law enforcement. Neither the prosecution nor law enforcement could have influenced the outcome; the govern-

ment's involvement is inconsequential. Finally, the documents prepared by the Gene Screen technicians were not directly accusatory; none of them compared the DNA profile they generated to defendant's.

■ Most of what we have said of documents originating from Gene Screen is also true of the other documents in the Medical Examiner's file that were admitted into evidence. Many of them reflect the work of technicians in the Medical Examiner's office. Although the authors of these documents did, after receiving the notification from the Division of Criminal Justice Services, know that defendant was a suspect, their reports do not directly link defendant to the crime. It was left to the testifying witness, Keblish, to draw the inference from the evidence that defendant's DNA profile matched those obtained from the rape kit.

The notification itself, in which the Division of Criminal Justice Services informed the Medical Examiner's office of the match, was also part of the Medical Examiner's file. This document presents a different issue. Even apart from any *Crawford* problem, the document was not admissible as a business record to prove the truth of the matter it stated: there was no proof that the preparer of that document did so in the ordinary course of business. Also, because the document comes close to a direct accusation that defendant committed the crime, it is less clearly nontestimonial hearsay than the other documents at issue. But we need not consider this issue further, because any error in admitting the document for its truth was harmless beyond a reasonable doubt. The People relied on Keblish's testimony to prove the match, and evidence that the same match had earlier been identified by the Division was cumulative and, in context, insignificant.

Defendant's remaining contentions are without merit.

## IV.

Accordingly, in each case the order of the Appellate Division should be affirmed.

READ, J. (concurring). I would hold that the forensic reports at issue in these appeals are not testimonial statements within the meaning of *Crawford v Washington* (541 US 36 [2004]). In *Rawlins*, the putative declarant matched up a faceless sample of physical evidence from the crime scene—a latent print—with defendant's fingerprint card; in *Meekins*, the putative declarants analyzed samples taken from the complainant's rape kit to

create a DNA profile. Neither report resembles the evils the Confrontation Clause addresses: they are not former testimony or the product of police interrogation; they do not fall within the civil-law mode of ex parte examination. Both "involve[ ], in principal part, a careful and contemporaneous reporting of a series of steps taken and facts found," which are "in the nature of a business record" (*United States v De La Cruz*, 514 F3d 121, 133 [1st Cir 2008] ["(B)usiness records are expressly excluded from the reach of *Crawford*"]; *see also United States v Feliz*, 467 F3d 227, 233-234 [2d Cir 2006] [statements properly admitted under the Federal Rules of Evidence as business records "cannot be testimonial because a business record is fundamentally inconsistent with what the Supreme Court has suggested comprise the defining characteristics of testimonial evidence"]; *People v Pacer*, 6 NY3d 504, 510 [2006] [remarking that "(t)he *Crawford* court concluded that business records would not have been considered testimonial at the time the Confrontation Clause was adopted," but rejecting prosecution's argument that the particular affidavit at issue was akin to a business or public record]).

Further, the distinctions advanced by the majority do not explain why the fingerprint comparison in *Rawlins* was testimonial, but the DNA profile in *Meekins* was not. As an initial matter, neither forensic report was made "to nail down the truth about past criminal events" (majority op at 148, quoting *Davis v Washington*, 547 US 813, 830 [2006]). The police detective who conducted the fingerprint comparison juxtaposed fingerprint patterns (i.e., loops, arches or whorls) and ridge characteristics from the latent print report with candidate fingerprints identified by computer search of a statewide database, documenting his conclusions when he found a match so that they might be verified or rejected by another examiner and a supervisor. The technicians documenting the steps taken to create the DNA profile were likewise doing so to allow subsequent reviewers to verify their work. Neither forensic report says anything about a past crime; both describe present events—the results of standardized testing procedures. The fact that these documents can be used to build a case against defendants for past crimes does not turn them into descriptions of past events.

The majority also suggests that the fingerprint comparison was testimonial but the DNA profile was not because the "salient characteristic of objective, highly scientific testing like

DNA analysis is that the results are not inherently biased toward inculpating the defendant; they can also exculpate. The inescapable corollary is that police or prosecutorial involvement is unlikely to have any impact on the test's results" (majority op at 153). But fingerprint comparisons (although arguably not as "highly scientific" as DNA analysis) may also exculpate. Moreover, does the majority mean to suggest that if the police had contracted out the fingerprint comparison to a private laboratory (thus eliminating police and prosecutorial involvement), the resulting forensic report would have been nontestimonial?

Finally, the majority finds the fingerprint comparison in *Rawlins* "could be nothing but testimonial" because it was "inherently accusatory and offered to prove an essential element of the crimes charged" (majority op at 157). But the same could be said of McCottry's statements in *Davis*, which the Supreme Court concluded were nontestimonial. Her statements not only provided evidence of defendant's identity, but of other elements of the crime charged. The determinative factor was not the accusatory nature of what she said or whether it helped to establish defendant's guilt (after all, if it had not, the People would not have offered it), but whether the statements resembled ex parte examinations.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, SMITH and PIGOTT concur with Judge JONES; Judge READ concurs in result in a separate opinion.

In each case: Order affirmed.