[59 NYS3d 337]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM RODRIGUEZ, Appellant.

First Department, July 25, 2017

APPEARANCES OF COUNSEL

*Seymour W. James, Jr.*, *The Legal Aid Society*, New York City (*Anita Aboagye-Agyeman* of counsel), for appellant.

*Cyrus R. Vance, Jr.*, *District Attorney*, New York City (*Sheila L. Bautista* and *Patrick J. Hynes* of counsel), for respondent.

**OPINION OF THE COURT**

KAHN, J.

On this appeal, we are asked to decide whether the judgment convicting defendant of burglary in the second degree (the burglary conviction), following a jury trial, should be vacated on the grounds that the verdict was unsupported by legally sufficient evidence, or that the verdict did not comport with the weight of the evidence, or that defendant was deprived of his right of confrontation at trial. Should we answer that question in the affirmative, we are further asked to determine whether the judgment convicting defendant, upon his plea of guilty, of various counts in a separate indictment (the plea conviction), should also be vacated on the ground that defendant's guilty plea was induced by a promise that his sentences for the burglary and the plea convictions would run concurrently. Additionally, we are asked to decide whether the sentences imposed for both convictions were excessive. For the reasons that follow, we hold that both judgments should be affirmed and that the sentences imposed were not excessive.

## I. Burglary Conviction

### A. Legal Insufficiency and Weight of the Evidence Claims

The verdict was supported by legally sufficient evidence and was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 348-349 [2007]). Defendant's identity as the burglar was strongly established by the match of his known DNA to the DNA found on wire cutters that had been stored within the glass enclosure on the victim's rooftop deck but were found tucked between cushions on the sofa in her apartment after the burglary (*see People v Harrison*, 22 AD3d 236, 236 [1st Dept 2005] [rejecting sufficiency and weight claims where "(t)he proof connecting defendant with the crime

consisted almost entirely of DNA evidence," which "was particularly powerful and established defendant's identity beyond a reasonable doubt"], *lv denied* 6 NY3d 754 [2005]).

## B. Confrontation Clause Claim

### 1. Defendant's Contention

Defendant claims that he was deprived of his Sixth Amendment right of confrontation under the Federal and State Constitutions by the introduction into evidence at trial of laboratory reports of DNA testing linking him to the crime based solely upon the testimony of Melissa Huyck, a criminalist from the New York City Office of the Chief Medical Examiner (OCME) who was not among the analysts who performed, witnessed or supervised the testing. Defendant's Confrontation Clause claim is unpreserved, and we decline to review it in the interest of justice. As an alternative holding, we reject it. However, we find that an extended discussion of the merits is warranted.

### 2. Legal Standards

As the accused in a criminal prosecution, a defendant has the right to be confronted with the witnesses who bear testimony against him (*Crawford v Washington*, 541 US 36, 51 [2004]). Therefore, "[a]s a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness" (*Bullcoming v New Mexico*, 564 US 647, 657 [2011]).

"[A] statement will be treated as testimonial only if it was 'procured with a primary purpose of creating an out-of-court substitute for trial testimony' " (*People v Pealer*, 20 NY3d 447, 453 [2013], *cert denied* 571 US —, 134 S Ct 105 [2013], quoting *Michigan v Bryant*, 562 US 344, 358 [2011]; *see Davis v Washington*, 547 US 813, 822 [2006] ["(Statements) are testimonial when the circumstances objectively indicate that . . . the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution"]).

Our Court of Appeals has set forth a test to be used in determining whether a report was prepared for such a "primary purpose" and is, therefore, testimonial. The "primary purpose" test consists of four factors:

> " '(1) whether the agency that produced the record is independent of law enforcement; (2) whether it

reflects objective facts at the time of their recording; (3) whether the report has been biased in favor of law enforcement; and (4) whether the report accuses the defendant by directly linking him or her to the crime' " (*People v Pealer*, 20 NY3d at 454, quoting *People v Brown*, 13 NY3d 332, 339-340 [2009]; *see People v Freycinet*, 11 NY3d 38, 41 [2008]).

Recently, in *People v John* (27 NY3d 294 [2016]), our Court of Appeals reaffirmed the centrality of the primary purpose test for Confrontation Clause purposes (*id.* at 307 ["(W)e have deemed the primary purpose test essential to determining whether particular evidence is testimonial hearsay requiring the declarant to be a live witness at trial"]).

### 3. Supreme Court's Trial Rulings

Notably, at trial, before OCME criminalist Huyck testified concerning the DNA testing performed in this case, the People sought a ruling from the court on the scope of evidence it would permit them to introduce from the OCME and Huyck about the DNA testing. Defense counsel argued against the introduction of reports of conclusions reached by nontestifying examiners, and urged that the admissible evidence from OCME's files should be limited to the pages of documents reflecting raw data that had been personally reviewed and initialed by Huyck.

Supreme Court's ruling was as follows: "The raw data, the data concerning the [DNA] testing comes in. What [Huyck] did comes in. All the other stuff about police reports and other material is out." Immediately after issuing that ruling, Supreme Court reiterated and clarified the ruling in the following manner: "So the raw data made by the people who actually did the test is admissible. As far as the data is concerned, what this witness [Huyck] did is admissible, not the other conclusions by these other individuals."

Huyck then proceeded to testify concerning the testing of DNA material taken from the wire cutters and the development of the DNA profile of an unknown male donor denominated as Male Donor A. Later that same day, before Huyck testified as to the DNA testing of the buccal swabs taken from defendant, Supreme Court further explained and clarified its earlier ruling. So much of that clarification as is relevant here is as follows:

"[M]y intention is to permit only the raw data

contained in these files so that ultimately Miss Huyck will ultimately use it to testify about her own comparisons to go before the jury. Only that data is to be considered evidence with respect to these files, and all extraneous material contained in the files, including . . . opinions of nontestifying examiners and experts[,] must be deleted."

Supreme Court's rulings were in keeping with the requirements of the *Crawford* rule as established under the case law in effect at that time. They adhered to federal constitutional standards by limiting the admission of statement evidence proffered in conjunction with Huyck's testimony to relevant evidence that either "was not prepared for the primary purpose of accusing a targeted individual" (*Williams v Illinois*, 567 US 50, 83 [2012]) or consisted of "testimonial statements by [a] declarant[ ] [Huyck] who [was] . . . subject to cross-examination" (*id.* at 76). In this regard, Supreme Court's rulings presaged *People v John* (27 NY3d 294 [2016], *supra*) by ensuring that Huyck's testimony would pertain to her role as a criminalist "who used . . . her [own] independent analysis on the raw data, as opposed to a testifying analyst functioning as a conduit for the conclusions of others" (*id.* at 315).[1] Moreover, *John* did nothing to change the standards set forth by *Crawford* and its progeny (*see generally id.* at 303-312).

4. The OCME Laboratory Reports

In this case, three OCME laboratory reports derived from DNA testing, accompanied by documents reflecting associated raw data, were introduced into evidence at trial. The first laboratory report concerned the DNA profile of an unknown male donor generated from DNA material extracted from the wire cutters found in the victim's apartment. It was dated January 2, 2013 and Huyck is listed on it as "Analyst." The second report discussed the generation of defendant's DNA profile based upon buccal swabs taken from defendant once he was

---

1. "OCME places criminalists in four grades, from level 1 for the least experienced to level 4 for full-time supervisors" (*People v Corey*, 52 Misc 3d 987, 989 n 2 [Sup Ct, NY County, June 27, 2016]). In this case, Huyck, who had been a Criminalist II when she testified in *John* (*see* 27 NY3d at 300) but had become a Criminalist III by the time of the DNA testing in this case, independently reviewed every page of the raw data she received, including the machine-generated graphs and the edit sheets, as evidenced by the appearance of her initials on every such page, and made her own determinations as to the validity of the raw data generated by the less experienced Criminalist I analysts.

identified as the suspect. Huyck's initials appear on the report as "Interpreting Analyst" and as the individual who checked the profile against the Local DNA Index System (LDIS) database. The third report, comparing the DNA profiles of the unknown male donor and defendant, was signed by Huyck as "Analyst," and reported her own conclusion that the two DNA profiles reflected in the first and second reports were a match.

The events leading to the development of the DNA profile of the unknown male donor, which were the subject of the first laboratory report, began when a pair of wire cutters was found in the couch of the burglary victim's living room by the police, who vouchered it in a sealed plastic bag for DNA testing. It was sent to the OCME laboratory, where its handles were swabbed for DNA material. The DNA material was then tested using polymerase chain reaction (PCR) DNA typing. PCR DNA typing involves four steps: "extraction (to release the DNA from any cells), quantitation (to determine how much DNA was present), amplification (to make millions of copies of the specific locations, or loci of the DNA, to be tested)" and electrophoresis, in which "the analyst uses an electrophoresis instrument and a sophisticated software program . . . to produce an electropherogram, which graphically depicts the peaks of the DNA analysis" (*John*, 27 NY3d at 300). Forensic analysts then review and routinely edit the machine-generated profiles by removing false peaks appearing in the data (*People v Rawlins*, 10 NY3d 136, 145 [2008], *cert denied* 557 US 934 [2009]).[2] From this testing, a DNA profile of an unknown single male donor of DNA material, "Male Donor A," was developed. There followed the first OCME laboratory report, which discussed the generation of the profile of Male Donor A and its suitability for uploading into state and local DNA databanks, such as LDIS, and ap-

---

**2.** False peaks may, as in this case, include "stutter," "a common 'echo' effect appearing on the DNA profile—usually one allele before its true allele, or less frequently, just after" (*People v Collins*, 49 Misc 3d 595, 606 [Sup Ct, Kings County, July 2, 2015]), or "pull-ups," which are caused by the failure of an improperly calibrated machine to distinguish among dye colors, in an effort to ensure that the software did not mistakenly remove true alleles (*see* John M. Butler, Fundamentals of Forensic DNA Typing at 213 [2010], cited in *John*, 27 NY3d at 298).

The editing process, which, according to Huyck, was, at the time of the editing in this case, undertaken solely by analysts whose titles are Criminalist I (*see* n 1, *supra*), involves a routine manual inspection of machine-generated graphs and elimination from those graphs of any false peaks, including stutters and pull-ups.

pended documents reflecting the raw data generated by OCME analysts.

■ A review of the first laboratory report through the lens of the four-factor *Pealer/Brown* "primary purpose" test demonstrates the nontestimonial nature of the laboratory report on the DNA profile of Male Donor A.

With respect to the first *Pealer/Brown* factor, independence of the reporting agency from law enforcement, according to Huyck, the testifying criminalist who is listed on that report as "Analyst," OCME, her agency, is not affiliated with the New York Police Department or the Office of the New York County District Attorney. Rather, it is affiliated with the New York City Department of Health and Mental Hygiene. Moreover, the degree of OCME's independence from law enforcement in each given case is appropriately measured by the function the agency performs in that case. For example, in *People v John*, where evidence recovered at a crime scene was submitted to OCME for performance of DNA testing in furtherance of the prosecution of a known suspect in a pending criminal action, OCME's role was not independent of the police and prosecutors (27 NY3d at 308 n 5). Here, by contrast, OCME's role at that point was that of a scientific agency performing DNA testing on physical evidence at a time when there was neither an identified suspect nor a pending criminal action. Thus, under the circumstances presented in this case, OCME acted independently of law enforcement.

With respect to the second *Pealer/Brown* factor, a review of the report in question reveals that it reflects objective facts at the time of their recording. Indeed, the fact that the report consists of "merely machine-generated graphs, charts and numerical data" presented without subjective analysis is an indication that the report is not testimonial in nature (*see People v Brown*, 13 NY3d at 340).

With regard to the third factor of the *Pealer/Brown* test, because the report does not name defendant or any other suspect, it is not biased in favor of law enforcement.

Concerning the fourth *Pealer/Brown* factor, because the DNA profile of Male Donor A was developed at a time when no suspect had been identified, the report names neither defendant nor any other suspect, and it does not accuse defendant by directly linking him to the crime (*see People v Freycinet*, 11 NY3d at 42 [report not testimonial where it "did not directly link defendant to the crime"]). Thus, the DNA profile of Male

Donor A is analogous to "the original DNA profiles in *Brown* and *Meekins*," which, as the *John* Court observed, "would not be considered testimonial hearsay . . . when the suspect was unknown and the defendant was later identified on a 'cold hit' from the CODIS [Combined DNA Index System] database" (*People v John*, 27 NY3d at 310). Therefore, the report on the DNA profile of Male Donor A was not prepared for the "primary purpose of creating an out-of-court substitute for trial testimony" and is nontestimonial in nature (*Pealer*, 20 NY3d at 453-454; *Brown*, 13 NY3d at 339-340; *see People v Alcivar*, 140 AD3d 425, 427 [1st Dept 2016], *lv denied* 28 NY3d 1070 [2016] [DNA testing report not testimonial where " 'test results, *standing alone*, shed no light on the guilt of the accused,' . . . notwithstanding that they provided circumstantial evidence of guilt in light of other evidence" (citation omitted)], quoting *Rawlins*, 10 NY3d at 159).

The events resulting in the development of the DNA profile of defendant, which was the subject of the second OCME laboratory report, began when the DNA profile of Male Donor A was uploaded into the local OCME DNA databank, which detected a possible match with a DNA profile already recorded in that databank. The profile of Male Donor A was then sent to the New York State Department of Criminal Justice Services, which provided defendant's name as that of the person whose DNA profile apparently matched that of Male Donor A. This information led to defendant's arrest, after which the People moved for leave to perform buccal swab DNA testing of defendant, which Supreme Court granted. Buccal swabs were then taken from defendant and the DNA material was tested using four-step PCR DNA typing. A DNA profile of defendant was generated from those swabs. The second laboratory report followed. That report concerns the generation of the DNA profile of the known defendant, and appended documents reflecting raw data generated by the testing analysts, each page of which was reviewed by Huyck.

On appeal, defendant does not challenge the second laboratory report on Confrontation Clause grounds or with regard to the manner in which the DNA testing of the buccal swab samples taken from him was performed by OCME. Accordingly, the situation presented in this case is completely different from that presented in *Williams v Illinois*, as referenced in *John*, because in this case the proof that the buccal swab samples were taken from defendant was unchallenged (*see*

*John*, 27 NY3d at 306, citing *Williams v Illinois*, 567 US at 57-58). Furthermore, the *John* Court distinguished *Williams* from cases such as *Bullcoming v New Mexico* (564 US 647 [2011]) and *Melendez-Diaz v Massachusetts* (557 US 305 [2009]), where, as here, "the forensic reports of the nontestifying analysts were introduced into evidence for the truth of the matter asserted" (*John*, 27 NY3d at 306).[3] In fact, the second report does not purport to establish defendant's involvement in criminal activity (*see Davis v Washington*, 547 US at 822).

The third OCME laboratory report, which was prepared by Huyck and lists her as the analyst, reports Huyck's review and comparison of the DNA profiles of Male Donor A and defendant and states her conclusion that the two profiles are a match.

Applying the four-factor *Pealer/Brown* test to the third report, at the time it was generated, OCME was acting in the role of assisting the police and prosecutors in developing evidence for use at trial. A review of this report reveals that it does not reflect objective facts at the time of its recording, but instead reflects Huyck's conclusions upon review of the raw data associated with the testing leading to the development of the two DNA profiles. By matching the DNA profile of Male Donor A with that of defendant, this report, in effect, accuses defendant of the burglary, and therefore is biased in favor of law enforcement. Further, the report could have served as "an out-of-court substitute for trial testimony" (*Pealer*, 20 NY3d at 453-454 [internal quotation marks omitted]). Therefore, this report is testimonial in nature. The report was, nevertheless, admissible, because Huyck was the analyst who prepared it, and she appeared at trial and was subject to cross-examination (*see Williams v Illinois*, 567 US at 75).

▮ With respect to any evidentiary concerns, hearsay analysis does not bar admission of the OCME reports. Huyck testified that all DNA analysis done at the OCME laboratory, which would include the analysis performed in this case, is documented and recorded. She further testified that the OCME laboratory has a business duty to keep such records, that the notes and reports of the observations of DNA testing analysts are recorded contemporaneously with the making of the observations, and that the notes and reports are made and

---

**3.** *People v Goldstein* (6 NY3d 119 [2005]), cited in *John* (27 NY3d at 306), is unlike this case, in that there the foundational facts upon which the expert testimony was based were not admitted into evidence (*see Goldstein*, 6 NY3d at 127-129).

kept by the OCME laboratory in the ordinary course of business. Thus, the DNA reports in question in this case were admissible as business records (see CPLR 4518; *Brown*, 13 NY3d 332, 341 [2009]).

We are mindful of the *John* Court's warning of the danger of admitting scientific reports as business records because such records may be sufficiently formal, even though not provided under oath, to be deemed testimonial, and, therefore, constitutionally inadmissible on Confrontation Clause grounds (see *People v John*, 27 NY3d at 312). In this case, however, both the report on the profile of Male Donor A and the report on the possible match of Male Donor A with a profile in the CODIS database were prepared before defendant was suspected of or charged with the crime. Thus, neither of those reports was sufficiently accusatorial and formal to be deemed testimonial. Although the third report, concerning the match of those two DNA profiles, is testimonial in nature, it was, nonetheless, admissible for the reasons we have already stated.

The view of our dissenting colleagues is that the admissibility of the DNA reports in this case would require the testimony of at least one analyst who had direct personal knowledge of the DNA testing used to prepare each of these reports. Among the phases of the DNA testing performed in this case was CODIS's identification of the DNA profile of the unknown suspect developed by the OCME laboratory, Male Donor A, as a possible match with a DNA profile maintained by CODIS. Thus, the logical consequence of the dissenters' view would be that, in this case and in all such cases, CODIS analysts with personal knowledge of that phase of the DNA testing would be required to testify as to how CODIS determined that there was a possible match of the DNA profile of the unknown suspect with a DNA profile in the CODIS database. The dissenters' view that any "analyst who actually did the testing" must testify would impose further restrictions on such evidence far beyond those contemplated by the Court of Appeals in *John*, requiring the testimony of any laboratory analyst anywhere in the country who had at any time developed and transmitted a DNA profile to CODIS for matching purposes. As the *John* Court explained, however, imposing such a requirement in all such cases would prove impracticable and unwieldy (27 NY3d at 312-313 ["Clearly, not every person who comes in contact with the evidence . . . must be produced"]). Rather, the standard could be met if "an analyst who witnessed, performed or

supervised the generation of defendant's DNA profile, *or who used his or her independent analysis on the raw data*, as opposed to a testifying analyst functioning as a conduit for the conclusions of others, [were] available to testify" (*id.* at 315 [emphasis added]).

5. Huyck Conducted an Independent Review and Drew Her Own Conclusions, in Contrast with *John*

██ Huyck's role in this case was that of a criminalist who performed an independent review of the raw data generated by the testing analysts (*see John* at 315). Thus, in this case the respective roles of the analysts who performed the DNA testing and final stage editing and the testifying criminalist who reviewed the resulting raw data differ greatly from those of the analysts and reviewing criminalist under the circumstances presented in *John*. In contrast with the situation in *John*, here, Huyck herself conducted an independent review of the raw data derived from the testing of the DNA material derived from both the physical evidence and from defendant's person, and was not merely "functioning as a conduit for the conclusions of others" (*id.* at 315). Put otherwise, in this case, as in *Brown*, and in contrast to *John*, Huyck, the expert witness, "testified that any conclusions or opinions she reached from the raw data . . . were her own" and were not merely conclusions of others with whom she agreed (*id.* at 310, citing *Brown*, 13 NY3d at 337). Upon her own examination of the machine-generated graphs and raw data in this case, Huyck concluded that the two DNA profiles were a match. Her conclusion, based upon her own "separate, independent and unbiased analysis of the raw data," was reflected in the OCME laboratory report bearing her name as analyst as well as in her own testimony at trial (*see id.* at 311). Here, in contrast to her testimony in *John*, Huyck did not base her testimony "solely on the reports of the nontestifying analysts [which were then] admitted into evidence for their truth" (*id.* at 310).

Additionally, in this case, the role played by the Criminalist I analysts who edited the machine-generated electropherograms was merely to perform the routine function of editing out any false peaks that may have appeared. Thus, in contrast with *John*, in this case, as in *Brown*, the function performed by the editing analysts was merely ministerial in nature, similar to that of a court clerk who routinely rejects an unsigned affidavit. This is a function that any trained clerk is equipped to undertake and does not involve "application of expertise or

judgment" or "skilled interpretation of . . . data" (27 NY3d at 311). And here, in contrast with *John*, Huyck's role as a higher ranking criminalist was to conduct an independent review of a report "consist[ing] of merely machine-generated graphs, charts and numerical data" (*Brown*, 13 NY3d at 340). Like the report in *Brown*, the raw data reviewed by Huyck in this case was devoid of any "conclusions, interpretations or comparisons . . . since the technicians' use of the typing machine would not have entailed any such subjective analysis" (*id.*). And, here, as in *Brown*, Huyck "interpreted the profile of the data represented in the machine-generated graphs; and she made the critical determination linking defendant to this crime" (*id.*). Thus, in this case, as in *Brown*, the only apparent subjective analysis made of the raw data and DNA profiles provided by the analysts was that of Huyck, who compared the two sets of raw data and DNA profiles and made the determination linking defendant to the crime.

Notably, although defense counsel had ample opportunity to object that Huyck's testimony veered beyond the scope of Supreme Court's ruling, she never did so. This further indicates that the People's evidence was well within the bounds of Supreme Court's ruling, and, accordingly, the applicable constitutional standards. Moreover, defense counsel had a full and fair opportunity to cross-examine Huyck, and did so.

The dissenters' concern with Huyck's failure to personally witness OCME's employment of safeguards in conducting DNA testing in this case, such as gowning up with mask, hairnet, gloves and lab coat and cleaning the bench top and utensils to be used in the examination with bleach and ethanol, is misplaced. Such considerations do not implicate Confrontation Clause concerns, since they are not testimonial statements against the accused; they merely affect the weight to be given by the jury to the evidence in question, not its constitutional admissibility.

Thus, defendant was not deprived of his right of confrontation by the trial testimony or by the introduction into evidence of the laboratory reports of the OCME criminalist who conducted a "separate, independent and unbiased analysis of the raw data" (*John* at 311). Accordingly, reversal on this ground is not warranted.

## II. Plea Conviction

In view of our conclusion that defendant's claims in the burglary conviction case do not warrant reversal, defendant's

alternative argument in the plea conviction case that this Court should also afford him the opportunity to withdraw his guilty plea because it was induced by a promise that the aggregate sentence imposed for that conviction would run concurrently with his sentence for the burglary conviction, is without merit (*cf. People v Fuggazzatto*, 62 NY2d 862, 863 [1984] [vacating plea because it was "induced by the understanding that the sentence would be concurrent with the sentence imposed for (another) conviction"]).

## III. Excessive Sentence Claims

Defendant also claims that the sentences imposed for his convictions were excessive. There is no basis for a reduction of the sentences, since the mitigating factors cited by defendant are outweighed by the seriousness of the instant offenses and defendant's criminal record.

Accordingly, the judgment of the Supreme Court, New York County (Richard D. Carruthers, J.), rendered March 19, 2014, convicting defendant, after a jury trial, of burglary in the second degree, and sentencing him, as a persistent violent felony offender, to a term of 20 years to life, and the judgment of the same court and Justice, rendered May 12, 2013, as amended May 20, 2014, convicting defendant, upon his plea of guilty, of burglary in the first degree (five counts), robbery in the first degree (five counts), robbery in the second degree (two counts), kidnapping in the second degree (six counts), and endangering the welfare of a child (two counts), and sentencing him to a concurrent aggregate term of 25 years to life, should be affirmed.

Acosta, J. (dissenting). The majority ruling is a transparent attempt to circumvent the controlling Court of Appeals decision in *People v John* (27 NY3d 294 [2016]). The *John* Court held that the testimony of the testifying criminologist (Melissa Huyck—who also testified in the present case) and DNA reports admitted into evidence pursuant to her testimony violated defendant's right to confront the analysts who actually generated the DNA profiles. Huyck merely reviewed the reports of the other OCME analysts, who did not testify, including the numerical DNA profiles generated after an editing process, saw that the necessary people had signed off, and agreed with their conclusions. The Court of Appeals explained that "Huyck was acting purely as a surrogate witness . . . in vouching for the accuracy of the DNA profiles," since "[h]er conclusory testimony

in this regard was based solely on the reports of the nontestifying analysts that were admitted into evidence for their truth and not based on a separate, independent and unbiased analysis of the raw data" (*id.* at 310-311).

This case is virtually indistinguishable from *John*, because Huyck admitted in her testimony here that she did not conduct the DNA analysis, and merely assumed that it was done properly. More importantly, the majority concedes that the third DNA report admitted into evidence, which compared Male Donor A's DNA with defendant's DNA and thus secured a conviction in this case, is testimonial in nature. This is particularly troubling, because defendant was convicted of burglary in the second degree and sentenced to 20 years to life in a case where the only evidence linking him to the burglarized apartment was DNA evidence found on a pair of wire cutters. Therefore, I strenuously disagree with my colleagues who appear bent on doing an end-run around *John*.

Here, Melissa Huyck testified that defendant's DNA evidence was found on the wire cutters. She testified that the profile generated from the wire cutters was used to identify defendant. She also testified that defendant's DNA was then taken for purposes of making a comparison. As in *John*, she did not do any of the testing herself, and candidly admitted that she assumed it was done properly. Through her testimony, three DNA reports were entered into evidence supporting her testimony as well as a chart comparing defendant's DNA profile to the DNA profile found on the wire cutters.

Although the majority insists that Huyck's testimony was proper because it focused only on raw data, it completely misses the point. She compared DNA profiles that may or may not have been generated properly. She had no way of knowing except by blind faith that her colleagues, who actually tested the DNA evidence but did not testify at trial, followed the established protocol. As noted above, *John* specifically rejected this approach as surrogate testimony that violates a defendant's constitutional right to confrontation (*John*, 27 NY3d at 310-311). Moreover, any emphasis by the majority "on formalism for the admissibility of business records is particularly unwise in the area of scientific reports, as the certification requirement can be easily subverted by a simple omission in the format of the documents, with a design to facilitate their use as evidence in a criminal trial" (*John*, 27 NY3d at 312 [DNA reports that are testimonial in nature must be analyzed

in terms of Confrontation Clause violations rather than simply being admitted as business records]). In other words, the Confrontation Clause trumps the business records exception. A review of the facts and relevant case law supports the conclusion that defendant's right to confrontation was violated.

The complainant lived by herself in an apartment on the top floor of a building in lower Manhattan. She had lived there since April 2011. She had a private rooftop deck, consisting of an open area and a glass-enclosed office containing a couch, a table, chairs, and a bookcase. On the morning of August 23, 2012, complainant traveled to Philadelphia to teach a class. She left her apartment in its normal condition, with the front door locked and all of the windows closed.

Complainant returned home around 12:30 a.m. on August 24 and saw that her front door was ajar; someone appeared to have rummaged through her rooms. She then noticed that her jewelry was missing from a drawer in the front bedroom closet. The contents of boxes that had been stored in the closet of the master bedroom were strewn across the floor.

Complainant called the police to report a break-in. She avoided touching things in her apartment aside from the aforementioned drawer. Police Officers Digena and Hennessy arrived at complainant's apartment in response to a radio report of a burglary. The police canvassed the apartment while avoiding touching anything, then went up to the roof. They saw a propane tank, which did not belong to complainant, next to the skylight, in an area that was supposed to be inaccessible.

The police called the Evidence Collection Unit, which sent Detective Jose Segura and Officer Stephen Schuldner the following morning. Complainant had avoided cleaning or touching anything in her apartment since discovering the break-in.

During the investigation conducted by Segura and Schuldner, complainant noticed that her wire cutter, which she described as a pair of pliers, was wedged between the cushions of the sofa in her living room. She testified that there was no legitimate reason for the wire cutter to be there, since she had not brought it into the apartment since she had last used it, two months earlier. She had bought it online and used it to install fencing on her rooftop deck, then left it in the bookcase in her rooftop office. While wearing latex gloves and a mask, Officer Schuldner vouchered the wire cutter in a sealed bag for DNA testing. Schuldner did not dust the wire cutter for

fingerprints, because he wanted to preserve any DNA. He collected a sample of complainant's DNA, in case the wire cutter contained DNA from both her and the perpetrator.

Schuldner dusted for fingerprints on both sides of the door to the apartment, the broken glass from the skylight, the bathroom walls, and the drawers from which jewelry was missing, but failed to find any fingerprints sufficient to be collected and tested. He noted that sometimes fingerprints cannot be collected or tested because they have been smudged.

Detective Segura searched for witnesses by knocking on other apartment doors in the building, and checked a surveillance camera located in the front of the building, but to no avail. No suspect was identified in the investigation of the building.

Melissa Huyck, a criminalist at the Office of the Chief Medical Examiner (OCME), testified as an expert in DNA analysis. Huyck testified that under office policy, each step of DNA testing conducted by OCME was observed by a witness, each DNA test was performed twice, and all results and analysts' conclusions were recorded. She also testified that she did not know if the policy had been followed in this case and that there were no records indicating if office policy had been followed. Any DNA profile compiled by OCME was uploaded to, among other things, a national database called the Combined DNA Indexing System (CODIS). Huyck noted that NYPD's paperwork on the vouchered wire cutter did not refer to any suspect.

She also testified that on October 14, 2012, OCME criminalist Michael Kuhn, who did not testify at trial, performed an analysis of the wire cutter that revealed a "significant amount of DNA" belonging to only one male donor on its handles. The handles contained five or six times more than the minimum amount of DNA required for testing, which suggested that the donor had used the tool "[f]orcefully or for a decent amount of time." This profile was uploaded to CODIS in December 2012 or January 2013. Shortly after, CODIS informed OCME of a possible match between the DNA recovered from the wire cutter and a certain DNA profile. OCME confirmed that the two profiles were a match, at which point CODIS, per standard procedure, informed OCME that defendant was the person whose DNA profile had been provided to OCME from the database.

According to Huyck, Detective Michael McCready, who also did not testify, collected a swab from inside defendant's mouth

and sent it to OCME, which used the sample to compile a profile of defendant's DNA. Huyck noted that she "didn't perform the lab work," and "just did the review of the results." She testified that as a Criminalist III she was being retrained so that she could do the lab work in the future, and that when the lab work was done in the present case, only "Criminalist Is were responsible for those duties." In fact, her duties did not include supervising the work of others. However, Huyck "compared the known DNA profile of . . . defendant to the profile developed from the swab on the wire cutters," and determined that "[t]hey were the same DNA profile," since they were "an exact match," based on looking at the numbers assigned to all 15 tested DNA locations, which were the same in both. Huyck testified that one would "expect to see this profile in approximately one in greater than 6.8 trillion people," i.e., about once if there were 1,000 copies of planet Earth, with its approximate population of 6.8 billion.

In contrast, a profile compiled from complainant's DNA sample did not match any of the DNA on the wire cutter. Huyck testified that DNA left by complainant on her wire cutter could have been replaced by a subsequent user of the wire cutter, or her DNA could have been diminished by sun or rain. Huyck further testified that the amount of DNA a person leaves on an object when touching it, known as a "primary transfer," depends on various factors, including how many times the person handles the object, how long the person spends touching the object, the cleanliness of the person's hands, how many skin cells the person typically sheds, and whether the person was perspiring at the time. A "secondary transfer" occurs when DNA left on an object by a person is later transferred to a different object; for example, if a person sneezes onto a pair of gloves, and the gloves later touch an object, the person's DNA may be transferred to the latter object.

Detective Segura testified that defendant was arrested after receiving a fax from OCME identifying defendant as "a perpetrator or someone of interest for this case." Complainant testified that she did not know defendant and had never given him permission to enter her apartment or remove her belongings from her apartment.

Defendant did not present any evidence at trial. The jury convicted defendant of second-degree burglary.

Defendant contends that he was deprived of his right to confront his accusers by Huyck's testimony on the DNA test-

ing, since Huyck was at best generally knowledgeable about OCME's DNA testing based on her experience as an OCME criminalist, but was not one of the analysts who conducted the testing. Although defendant's Confrontation Clause claim is unpreserved,[1] I believe that reversal in the interest of justice is warranted, because the only evidence linking defendant to the burglary was the DNA evidence at issue.

"Testimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" (*Crawford v Washington*, 541 US 36, 59 [2004]). A statement is testimonial "only if it was procured with a primary purpose of creating an out-of-court substitute for trial testimony" (*People v Pealer*, 20 NY3d 447, 453 [2013], *cert denied* 571 US —, 134 S Ct 105 [2013] [internal quotation marks omitted]). The following factors should be considered in determining whether such a primary purpose existed:

> "(1) whether the agency that produced the record is independent of law enforcement; (2) whether it reflects objective facts at the time of their recording; (3) whether the report has been biased in favor of law enforcement; and (4) whether the report accuses the defendant by directly linking him or her to the crime" (*id.* at 454 [internal quotation marks omitted]).

Applying this standard in *People v John* (27 NY3d 294 [2016], *supra*), where Huyck also testified in the same capacity as she did in the present case, the Court of Appeals found that defendant's confrontation rights were violated. In *John*, the police arrested the defendant in response to a report that he had pointed a gun at someone just outside his apartment building; the police sent DNA recovered from a gun found in the building's basement to OCME; and the police attached a report to the vouchered gun informing OCME that the defendant had been arrested for possessing the gun (*id.* at 298). Huyck testified at the defendant's trial about the methods used by nontes-

---

1. Defense counsel failed to object to the admission of Huyck's testimony and there was no strategic or other legitimate explanation for this failure (*see People v Rivera*, 71 NY2d 705, 709 [1988]). Indeed, counsel was aware that the witness did not conduct the tests herself, because the prosecutor informed the court and the defense about this before Huyck testified. The right to effective assistance of counsel can be violated "by even an isolated error. . . if that error is sufficiently egregious and prejudicial" (*see Murray v Carrier*, 477 US 478, 496 [1986]).

tifying analysts, which were contemporaneously reviewed by her. The Court of Appeals found that the DNA reports were testimonial because OCME generated and analyzed the DNA profiles "in aid of a police investigation of a particular defendant charged by an accusatory instrument and created for the purpose of substantively proving the guilt of a defendant in his pending criminal action" (*id.* at 308). The Court of Appeals stated that

> "[t]he primary purpose of the laboratory examination on the gun swabs could not have been lost on the OCME analysts, as the laboratory reports contain[ed] the police request for examination of the gun swabs on the basis that the 'perp' handled the gun and repeatedly identif[ied] the samples as 'gun swabs,' " and some "documents in the OCME file refer[red] to the suspect (defendant) by name" (*id.* at 308).[2]

Further, in *John*, Huyck merely testified that she had "reviewed the reports of the other OCME analysts, including the numerical DNA profiles generated after an editing process, saw that the 'necessary people' had signed off and agreed with their conclusions"; the Court of Appeals found that this "cursory testimony vitiated defendant's right to confront the analysts who actually generated the DNA profiles" (*id.* at 310). The Court of Appeals explained that "Huyck was acting purely as a surrogate witness . . . in vouching for the accuracy of the DNA profiles," since "[h]er conclusory testimony in this regard was based solely on the reports of the nontestifying analysts that were admitted into evidence for their truth and not based on a separate, independent and unbiased analysis of the raw data" (*id.* at 310-311). Notably, "Huyck opined that the two obviously identical series of [15] numbers, represented in box score form, were a match and that the source of the two DNA profiles were the gun and defendant" (*id.* at 301)—which also occurred in the instant case. Accordingly, the Court of Appeals concluded

---

**2.** The Court of Appeals further found that the DNA reports were "sufficiently formal to be considered testimonial," since they set forth "facts prepared to be used as critical evidence at a criminal trial," and "every person who prepared the information in the laboratory reports had a business duty to do so truthfully and accurately" (*id.* at 312). The Court of Appeals also noted that "the independent nature of [OCME] does not exclude it from the primary purpose test," "since the predominant purpose of OCME's Forensic Biology Department is to provide DNA testing on crime scene evidence for the New York City Police and prosecutors" (*id.* at 308 n 5).

that "at least one analyst with the requisite personal knowledge" was required to testify (*id.* at 313).

The instant case is controlled by *John.* To be sure, here OCME compiled the profile of the DNA recovered from the wire cutter before any suspect had been identified. However, that fact alone is insufficient to distinguish this case from *John,* where OCME was informed of the suspect's name from the outset. OCME in this case eventually compared the DNA profiles recovered from the wire cutter and provided by CODIS, determined that they were an exact match, and so informed CODIS. At that point, in accordance with the standard CODIS procedure, OCME was informed of the identity of the person whose DNA profile had been analyzed by OCME, for the purpose of linking defendant to the burglary. OCME further carried out that purpose by sending a fax to the police identifying defendant as "a perpetrator or someone of interest" in this case, and the police then arrested defendant, apparently based on that information.

This case is distinguishable from *Williams v Illinois* (567 US 50 [2012]), a rape case in which the prosecutor called an expert who testified that a DNA profile compiled by a private laboratory from a vaginal swab from the victim "matched a profile produced by the state police lab using a sample of [the defendant]'s blood" (576 US at 56). The defendant objected that he did not have an opportunity to cross-examine anyone involved in preparing the private lab's report. A plurality opinion by Justice Alito (Alito was joined by Chief Justice Roberts and Justices Kennedy and Breyer and, in part, by Justice Thomas) found that the expert's testimony did not violate the *Crawford* rule, for two reasons: first, the expert could testify based on documents that were not themselves in evidence, and, second, under the primary purpose doctrine, the original DNA testing did not involve a targeted individual. Justice Thomas concurred with respect to the first reason. However, the majority of our Court of Appeals in *John* noted that the evidence would not be admissible on that theory under New York law:

> "First, [the Supreme Court plurality in *Williams v Illinois*] concluded that the fact that the source of the DNA profile was found on the semen from the victim's vaginal swabs was not a fact admitted into

evidence, as the lab report setting forth this information had not been admitted, and the expert's reference to that fact was not offered for the truth of the matter asserted therein. Pivotally, the Court opined that since this was a bench trial, the trier of fact, which was a judge and not a layperson, would understand this evidentiary distinction (*see* 567 US at —, 132 S Ct at 2234-2235), i.e., that the factual statements had been 'related by the expert solely for the purpose of explaining the assumptions on which [his or her] opinion rest[ed]' (567 US at —, 132 S Ct at 2228). Since the expert's opinion evidence of a DNA match in *Williams* had no relevancy without proof that the defendant's DNA profile was derived from the vaginal swabs from the rape victim and that the DNA profile was accurate, and neither foundational fact was admitted into evidence, this opinion testimony was inadmissible under New York law (*see People v Goldstein*, 6 NY3d 119, 127-129 [2005])" (*People v John*, 27 NY3d 294, 305-306 [2016]).

And, significantly, Justice Thomas did not join Justice Alito as to the second reason, so it did not garner a majority.

Here, by contrast, defendant does not merely challenge testimony about a DNA profile created by an entity unaware of any suspect, but instead challenges the use of an expert witness to provide "nothing more than surrogate testimony to prove" the accuracy of OCME's conclusion that defendant's DNA matched the DNA found at the crime scene (*John*, 27 NY3d at 309). After all, Huyck testified that OCME employees other than herself received a possible match from CODIS, the national database, and CODIS identified defendant to OCME only after OCME employees other than Huyck confirmed that his DNA profile matched the sample from the wire cutter.

The majority makes much of the trial court's ruling that only raw data could come in so that Huyck could make a comparison. But just as in *John*, where the Court of Appeals noted that although it had "previously held that certain DNA laboratory reports were raw data or machine-generated[,] Huyck's testimony and the laboratory reports admitted into evidence prove otherwise" (*John*, 27 NY3d at 309-310 [citation omitted]). Here, Huyck testified that the analysis of the DNA found on the wire cutter, when submitted to CODIS, led CODIS to identify defendant by his DNA; not surprisingly, defendant's

DNA sample then matched the sample found on the wire cutter. She also testified that someone else did the DNA testing. In fact, as noted above, she testified that as a Criminalist III she was being retrained so that she could do the lab work in the future, and that when the lab work was done in the present case, only "Criminalist Is were responsible for those duties." In short, regardless of the wording of the ruling, Huyck's testimony and the laboratory reports admitted into evidence in this case violated defendant's right to confront the analyst who actually did the testing (*John*, 27 NY3d at 310 [Huyck's "cursory testimony vitiated defendant's right to confront the analysts who actually generated the DNA profiles"]).

Huyck had not "witnessed, performed or supervised the generation of defendant's DNA profile," nor had she "used . . . her independent analysis on the raw data" (*id.* at 315). Rather, just as in *John*, Huyck was merely acting as a surrogate witness. Indeed, on direct, when asked whether the OCME's safeguards were utilized in this case, she responded, "I didn't personally examine them, but I would assume that the analyst did that." The majority trivializes the safeguards imposed by OCME, by referring to them as "gowning up" and "cleaning"; the safeguards also include, as Huyck testified, having a second person observe the testing process, using positive and negative controls, performing the test twice, and checking equipment. Those safeguards are what make the test results reliable and therefore admissible.

Furthermore, the People's argument that "the OCME report . . . consist[ed] of merely machine-generated graphs, charts and numerical data, involving no conclusions, interpretations, comparisons or subjective analysis" was strongly rejected by the Court of Appeals in *John*:

> "We will not indulge in the science fiction that DNA evidence is merely machine-generated, a concept that reduces DNA testing to an automated exercise requiring no skill set or application of expertise or judgment. Likewise, the sophisticated software programs require trained analysts who engage in skilled interpretation of the data . . . to construct the DNA profile. Even Huyck conceded that the testing and reviewing analysts independently make these necessary and qualitative judgments by applying the laboratory's thresholds when using the software" (27 NY3d at 311).

The People's observations that Huyck was well experienced and defendant had the opportunity to cross-examine her are insufficient, because the Confrontation Clause entitled him to cross-examine at least one analyst with direct personal knowledge of the DNA testing (*see John*, 27 NY3d at 313).

Tom and Kapnick, JJ., concur with Kahn, J.; Acosta, P.J., and Gesmer, J., dissent in an opinion by Acosta, P.J.

Order, Supreme Court, New York County, rendered March 19, 2014, and judgment same court, rendered May 12, 2013, as amended May 20, 2014, affirmed.