People v Wakefield (2019 NY Slip Op 06143)





People v Wakefield


2019 NY Slip Op 06143


Decided on August 15, 2019


Appellate Division, Third Department


Pritzker, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: August 15, 2019

107724

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
JOHN WAKEFIELD, Appellant.

Calendar Date: May 2, 2019

Before: Garry, P.J., Mulvey, Aarons, Rumsey and Pritzker, JJ.


Matthew C. Hug, Albany, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



OPINION AND ORDER
Pritzker, J.
Appeal from a judgment of the Supreme Court (Coccoma, J.), rendered May 27, 2015 in Schenectady County, upon a verdict convicting defendant of the crimes of murder in the first degree and robbery in the first degree.
A caseworker from an organization that assists individuals with mental health issues, such as the victim, performed a welfare check at the victim's apartment after he failed to attend a scheduled appointment and could not be contacted. The victim was discovered dead in his apartment with a guitar amplifier cord wrapped around his neck. There was no indication of forced entry into the apartment or that a struggle had taken place. There was also no indication that his death was a suicide. An investigation ensued, during which several items owned by the victim, including a laptop, a PlayStation and an orange duffle bag, were discovered to be missing from his apartment. After a reward was offered for information about the victim's death, a friend of defendant came forth and advised law enforcement officials that defendant had admitted to him that he had killed the victim.
Defendant was subsequently charged in a multicount indictment in connection with the victim's death. Law enforcement collected a buccal swab from defendant to compare his DNA to that found at the crime scene. The data was eventually sent to Cybergenetics, a private company that used a software program called TrueAllele Casework System (hereinafter TrueAllele), for further testing [FN1]. The DNA analysis by TrueAllele revealed, to a high degree of probability, that defendant's DNA was found on the amplifier cord, on parts of the victim's T-shirt and on the [*2]victim's forearm. Prior to trial, defendant moved to preclude admission of evidence derived from TrueAllele, or alternatively, for a hearing under Frye v United States (293 F 1013 [DC Cir 1923]) to test the technology's general acceptance within the relevant scientific community. Supreme Court granted the motion to the extent of permitting a Frye hearing. At the Frye hearing, Supreme Court heard the testimony of Mark Perlin, the founder, chief scientist and chief executive officer of Cybergenetics, among others. Following the Frye hearing, the court rendered a decision concluding that TrueAllele was generally accepted within the relevant scientific community (47 Misc 3d 850, 854 [Sup Ct, Schenectady County 2015]). A jury trial was held, after which defendant was convicted of murder in the first degree and robbery in the first degree. Defendant was sentenced, as a second felony offender, to concurrent prison terms, the greatest of which was life in prison without the possibility of parole. Defendant appeals. We affirm.
Defendant initially challenges Supreme Court's Frye ruling that TrueAllele was generally accepted by the relevant scientific community and not novel. The introduction of novel scientific evidence requires a determination as to its reliability consistent with the protocol articulated in Frye v United States (supra). "That protocol requires that expert testimony be based on a scientific principle or procedure which has been sufficiently established to have gained general acceptance in the particular field in which it belongs" (People v Wernick, 89 NY2d 111, 115 [1996] [internal quotation marks, emphasis and citations omitted]). "It emphasizes counting scientists' votes, rather than on verifying the soundness of a scientific conclusion" (Parker v Mobil Oil Corp., 7 NY3d 434, 447 [2006] [internal quotation marks and citation omitted]).
At the Frye hearing, Perlin explained that TrueAllele "automates the interpretation of the data signals that have already been generated by a laboratory." Perlin testified that DNA electropherograms are commonly analyzed by a person with some computer assistance. TrueAllele, however, takes the data that is entered and "proposes possibilities for what different genotypes can be." TrueAllele employs the Markov Chain Monte Carlo algorithm (hereinafter MCMC), which, according to Perlin, is "basically a way of solving integration problems" and "gives the probabilities of all the different possibilities, not just finding what might be a maximum possibility." Perlin also testified that TrueAllele is designed to have a certain degree of artificial intelligence to make additional inferences as more information becomes available. Perlin explained that, after objectively generating all genotype possibilities, TrueAllele answers the question of "how much more the suspect matches the evidence [than] a random person would," and the answer takes the form of a likelihood ratio.
The record reflects that articles evaluating TrueAllele have been published in six separate forensics journals. In addition, at the time of the Frye hearing, TrueAllele had undergone approximately 25 validation studies, some of which appeared in peer-reviewed publications [FN2]. One peer-reviewed publication noted that, when a victim reference was available, "the computer was [4½] orders of magnitude more efficacious than human review on the same data" and that, when a victim reference was unavailable, "the average efficacy of the computer increased to six orders of magnitude." Another publication stated that, "[w]hile [TrueAllele] does find more matches and computes stronger statistics on average, it examines DNA evidence objectively without introducing bias that may favor the prosecution or defense," further noting that TrueAllele "maintains excellent specificity" and "calculates DNA match statistics with precision." The DNA Subcommittee of the New York State Forensic Science Commission offered a binding recommendation that TrueAllele be used by the State Police for its forensic casework. Approximately one month after the Subcommittee issued its recommendation, the full Commission approved TrueAllele for forensic casework. Perlin testified that TrueAllele was used to deconvolute the remains of victims from the September 11, 2001 World Trade Center attacks upon the request from the New York City Chief Medical Examiner's office. The National Institute of Standards and Technology, a division of the United States Department of Commerce, [*3]purchased TrueAllele, and its representatives have given presentations regarding TrueAllele's effectiveness. At the time of the Frye hearing, TrueAllele had also been used in various states and had been deemed admissible in Virginia, Pennsylvania and California.
Supreme Court found that "there [was] a plethora of evidence in favor of [TrueAllele], and there [was] no significant evidence to the contrary" (47 Misc 3d at 859). In view of the evidence adduced at the Frye hearing, we find that the court's ruling was proper (see People v Hamilton, 255 AD2d 693, 694 [1998], lv denied 92 NY2d 1032 [1998]; see generally People v Wesley, 83 NY2d 417, 426-427 [1994]). To the extent that defendant claims that the Frye hearing was a "farce" because he did not have the opportunity to review TrueAllele's source code,[FN3] such claim is waived inasmuch as he proceeded with the Frye hearing in the absence of the source code and did not object in doing so. We further note that defendant did not argue in his post-Frye submission that the hearing was a farce because he did not have the source code.
Defendant also argues that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. As relevant here, a person is guilty of murder in the first degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person" and "the victim was killed while the defendant was in the course of committing . . . and in furtherance of robbery" (Penal Law § 125.27 [1] [a] [vii]). As also relevant here, "[a] person is guilty of robbery in the first degree when he [or she] forcibly steals property and when, in the course of the commission of the crime . . ., he [or she] . . . [u]ses . . . a dangerous instrument" (Penal Law § 160.15 [3]).
In particular, defendant argues that the evidence did not establish that he stole anything from the victim. We disagree. The victim's stepsister testified at trial that, shortly after the incident in question, she was allowed to go back to the victim's apartment and clean it out and, as she was doing so, she noticed that the victim's laptop and PlayStation were missing. Kevin Allen, an inmate who was incarcerated with defendant pending trial, testified that defendant admitted to him that he took from the victim's apartment cash, crack cocaine, a laptop and a PlayStation, as well as other items that he thought that he could sell. The People adduced evidence that defendant was known to sell or trade electronics for drugs and that, on one occasion, defendant went to a drug house and said that he had a PlayStation and a laptop to trade and was seen in possession of a bag nearly identical to a unique duffle bag known to belong to the victim. Viewing the foregoing evidence in the light most favorable to the People, as we must, we find that it was legally sufficient to establish that defendant stole property belonging to the victim (see People v Jiminez, 36 AD3d 962, 963 [2007], lv denied 8 NY3d 947 [2007]; People v Hutcherson, 25 AD3d 912, 914 [2006], lv denied 6 NY3d 849 [2006]; People v Rouse, 4 AD3d 553, 555 [2004], lv denied 2 NY3d 805 [2004]).
We are also unpersuaded by defendant's argument that the trial evidence was not legally sufficient to establish that he killed the victim in furtherance of robbing him. Leon Horton, another inmate who was incarcerated with defendant, testified that defendant admitted to him that he went to "some guy's" house to steal an amplifier and music equipment but, because "things didn't go well," an argument occurred and then "there [was] a rope around the guy's neck." Furthermore, forensic testing revealed the presence of defendant's DNA at the crime scene. In this regard, Perlin testified at trial that, based upon TrueAllele's analysis of the data, the match between defendant's DNA profile and the DNA found on the guitar amplifier cord was 5.88 billion times more probable than a coincidental match to an unrelated black person, the [*4]match between defendant's DNA and that found on the outside of the rear collar of the victim's T-shirt was 170 quintillion times more probable than coincidental, the match between defendant's DNA and that found on the outside of the front collar of the victim's T-shirt was 303 billion times more probable than coincidental and the match between defendant's DNA and that found on the victim's forearm was 56.1 million times more probable than coincidental. Viewing this evidence in the light most favorable to the People, as well as the evidence of the missing items from the victim's apartment, we find that the People adduced legally sufficient proof to support the conviction for murder in the first degree (see People v Valcarcel, 160 AD3d 1034, 1036-1037 [2018], lvs denied 31 NY3d 1081, 1088 [2018]; People v Chaplin, 134 AD3d 1148, 1151-1152 [2015], lv denied 27 NY3d 1067 [2016]).
As to defendant's weight of the evidence claim, although a contrary result would not have been unreasonable, viewing the evidence in a neutral light, weighing the probative force of the conflicting testimony and considering the strength of the inferences that could be drawn therefrom, we are satisfied that the verdict was supported by the weight of the evidence (see People v Marryshow, 162 AD3d 1313, 1317 [2018]; People v Callicut, 101 AD3d 1256, 1259-1260 [2012], lvs denied 20 NY3d 1096, 1097 [2013]; People v Johnson, 38 AD3d 1012, 1013-1014 [2007]). Defendant questions the veracity and recollection of the witnesses who testified on behalf of the People, but such matters pertain to the credibility of the witnesses. Likewise, to the extent that defendant put forth evidence in his case-in-chief providing a different account as to his whereabouts at the time of the victim's death, the jury was entitled to reject such testimony (see People v Hilton, 166 AD3d 1316, 1318 [2018], lv denied 32 NY3d 1205 [2019]). Taking into account the DNA evidence and deferring to the jury's resolution of the witnesses' credibility, we see no basis to disturb the verdict as against the weight of the evidence (see People v Mosley, 121 AD3d 1169, 1170 [2014], lv denied 24 NY3d 1086 [2014]).
Defendant also argues that his right to confront witnesses was violated by not having access to TrueAllele's source code. This argument raises legitimate and substantial questions concerning due process as impacted by cutting-edge science. Given the exponential growth of technologies such as artificial intelligence, to embrace the future we must assess, and perhaps reassess, the constitutional requirements of due process that arise where law and modern science collide (see e.g. Christian Chessman, A "Source" of Error: Computer Code, Criminal Defendants, and the Constitution, 105 Cal L Rev 179 [2017]; Katherine Kwong, The Algorithm Says You Did It: The Use of Black Box Algorithms to Analyze Complex DNA Evidence, 31 Harv JL & Tech 275 [2017]; Andrea Roth, Machine Testimony, 126 Yale LJ 1972 [2017]; Edward J. Imwinkelried, Computer Source Code: A Source of the Growing Controversy Over the Reliability of Automated Forensic Techniques, 66 DePaul L Rev 97 [2016]). Defendant's novel Confrontation Clause challenge, specifically, that the source code itself is an out-of-court declarant, raises these profound questions.
Initially, we disagree with the People's contention that this argument is not preserved. "Concisely stated, [the doctrine of preservation] requires the parties to an adversary proceeding to press their claims at a procedural stage and in a manner by which they may be efficaciously determined, or otherwise forfeit their right to be heard on the issue" (People v Jones, 81 AD2d 22, 29 [1981]; see CPL 470.05 [2]; People v Martin, 50 NY2d 1029, 1031 [1980]). Here, defendant raised his Confrontation Clause argument in his motion in limine before Supreme Court, the People had an opportunity to, and did, respond and "[the court] ruled definitively on the legal argument that defendant makes on this appeal" (People v Finch, 23 NY3d 408, 412 [2014]; see generally People v Jackson, 29 NY3d 18, 23 [2017]; People v Graham, 25 NY3d 994, 997 [2015]).
Before reaching the merits, a discussion of genetics and the relevant technology is necessary to understand the legal issues at play. Perlin, both at the Frye hearing and at trial, testified at length as to how TrueAllele computes the likelihood ratios. First, it is important to understand that the DNA extraction is not performed by TrueAllele. Here, the DNA extraction was done by a scientist at the State Police Forensic Investigations Center, and the raw data derived from the extraction was forwarded to Cybergenetics for additional testing. Perlin [*5]testified that there are two basic methodologies used in forensic DNA analysis. The first is a traditional approach and is undertaken through a process known as combined probability inclusion (hereinafter CPI), which involves, in relevant part, an analyst choosing which loci to report on and the application of thresholds to the data. These thresholds, which are often set by a manufacturer or laboratory, are intended to simplify the DNA for visual human review by eliminating consideration of possible artifacts and low template DNA so as to increase reporting confidence. The other method of DNA testing at issue is known as a probabilistic method, which can be either semi- or fully-continuous [FN4]. According to Perlin, semi-continuous probabilistic systems still derive information from the alleles actually present and still apply certain thresholds, but these systems seek to make more use of the data available than that utilized in CPI. In contrast, fully-continuous probabilistic systems, such as TrueAllele, do not employ initial human analyst decision-making and, instead, consider all available data to look at more patterns. Thus, although CPI employs probabilities, it does not make use of all of the data produced, whereas TrueAllele considers all available data to look at more patterns.
To that end, TrueAllele utilizes the MCMC algorithm, which is used to solve high dimension calculus problems that would be impossible or impractical without a computer so as to identify all possibilities, not just the maximum possibility (see Ben Shaver, A Zero-Math Introduction to Markov Chain Monte Carlo Methods, Towards Data Science, available at https://towardsdatascience.com/a-zero-math-introduction-to-markov-chain-monte-carlo-methods-dcba889e0c50). MCMC is part of the public domain and, according to Perlin, is used in nearly every field of science. Perlin explained that the source code underlying TrueAllele is a "blueprint," or what provides TrueAllele with the instructions on how to execute the MCMC algorithm. More specifically, the human-written source code is turned into object code [FN5] by an application, and the object code then executes the program. Perlin explained that TrueAllele utilizes approximately 170,000 lines of source code that have been developed, replaced and added to over the past 25 versions of the software. The software includes the user interface, which is the way TrueAllele interacts with a DNA database and furnishes its directions on solving the questions posed. The source code is protected as a trade secret and is only known by two individuals, one of whom is Perlin. Perlin also explained that TrueAllele is what is known as an "expert system," describing how, beyond the calculations made pursuant to the above mathematics, the program is designed to have a certain degree of artificial intelligence in order to make additional inferences as more information becomes available.
Turning to the merits, the Confrontation Clause of the Sixth Amendment of the US Constitution and NY Constitution, article I, § 6 guarantee a defendant, as the accused in a criminal prosecution, the right to be confronted with the witnesses who bear testimony against him or her (see Melendez—Diaz v Massachusetts, 557 US 305, 309 [2009]; Crawford v Washington, 541 US 36, 51 [2004]; People v John, 27 NY3d 294, 303 [2016]). "Therefore, 'as a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness'" (People v John, 27 NY3d at 303, quoting Bullcoming v New Mexico, 564 US 647, 657 [2011]). "[A] statement will be treated as testimonial only if it was procured with [the] primary purpose of creating an out-of-court substitute for trial testimony" (People v Pealer, 20 NY3d 447, 453 [2013] [internal quotation marks and citations omitted], cert denied 571 US 846 [2013]). The Court of Appeals has set forth a four-factor test to be used when determining whether a record or report was prepared for such a "primary purpose" and is, therefore, testimonial: "'(1) whether the agency that produced the record is independent of law enforcement; (2) whether it reflects objective facts at the time of their recording; (3) whether the report has been biased in favor of law enforcement; and (4) [*6]whether the report accuses the defendant by directly linking him or her to the crime'" (id. at 454, quoting People v Brown, 13 NY3d 332, 339-340 [2009]; see People v Rodriguez, 153 AD3d 235, 238-239 [2017], affd 31 NY3d 1067 [2018]).
Applying this test to the TrueAllele report, although Cybergenetics is independent from law enforcement, at the time the report was generated, Cybergenetics was "acting in the role of assisting the police and prosecutors in developing evidence for use at trial" (People v Rodriguez, 153 AD3d at 244). Also, the report reflects TrueAllele's conclusions "upon review of the raw data associated with the testing" (id.). TrueAllele, by running at the source code's direction, compared DNA found at the crime scene to that of defendant's DNA and generated the report containing the likelihood ratios, which, in effect, implicates defendant in the murder; thus, it is clearly biased in favor of law enforcement (see id.). Accordingly, application of the primary purpose test reveals that the TrueAllele report is testimonial in nature (see People v John, 27 NY3d at 307-308; People v Rodriguez, 153 AD3d at 244).
Despite concluding that the TrueAllele report is testimonial, we do not find, given the particular facts of this case, that the source code, even through the medium of the computer, is a declarant. This is not to say that an artificial intelligence-type system could never be a declarant, nor is there little doubt that the report and likelihood ratios at issue were derived through distributed cognition between technology and humans (see Itiel E. Dror & Jennifer L. Mnookin, The Use of Technology in Human Expert Domains: Challenges and Risks Arising from the Use of Automated Fingerprint Identification Systems in Forensic Science, 9 Law, Probability & Risk 47, 48-49 [2010]). Indeed, similar to many expert reports, the testimonial aspects of the TrueAllele report are formulated through a synergy and distributed cognition continuum between human and machine (see Itiel E. Dror & Jennifer L. Mnookin, The Use of Technology in Human Expert Domains: Challenges and Risks Arising from the Use of Automated Fingerprint Identification Systems in Forensic Science, 9 Law, Probability & Risk at 48), but this fact alone does not tip the scale so far as to transform the source code into a declarant.
As Perlin explained at the Frye hearing, there is human input when utilizing TrueAllele. Among other things, a human analyst tells the computer what to download and under what conditions to analyze the data, the analyst tells the computer what questions to ask when interpreting the data and the analyst downloads certain results from the computer, the analyst determines how many "runs," or cycles, of the data the system will complete and the analyst then makes comparisons to form the likelihood ratios. Also key to our analysis is that Perlin, the creator of TrueAllele and the individual who wrote the underlying source code, was present in court and testified, at length, as to genetic science, the TrueAllele program and the formulation of the TrueAllele report through the computer processors and algorithms, including the MCMC algorithm (compare Melendez-Diaz v Massachusetts, 557 US at 311; People v John, 27 NY3d at 301-302, 308-309). Given the totality of the circumstances present here, we find that Perlin was the declarant in the epistemological, existential and legal sense rather than the sophisticated and highly automated tool powered by electronics and source code that he created. Accordingly, because Perlin testified at trial, we find that there was no Confrontation Clause violation as alleged by defendant because he had the opportunity to confront his true accuser.[FN6]
Defendant's claim that Supreme Court's ruling limiting his cross-examination of Horton violated his right to confrontation is without merit. Prior to Horton's testimony, the court initially ruled that defendant could not ask Horton about the underlying facts of pending charges for which he secured some consideration in exchange for his testimony. Horton then testified on direct examination that he would be receiving a lesser sentence in connection with pending charges related to the possession and sale of drugs. During the middle of Horton's cross-examination, defendant requested that the court revisit its prior ruling. After hearing argument on the issue, the court adhered to its original ruling. Notwithstanding this ruling, defendant questioned Horton about his history of drug crimes, his violation of his parole, what the pending charges were and what offers or promises he had been given in exchange for his testimony. Under these circumstances, we find that the court's ruling was proper (see People v Cole, 196 AD2d 634, 635 [1993]).[FN7]
We also reject defendant's assertion that Supreme Court erred in determining that a 2010 pretrial identification by a witness was confirmatory. At a Rodriguez hearing held during the trial, a witness testified to various interactions that he had with defendant, which included drug transactions between the two of them, seeing defendant on the street and socializing with him. On one occasion, the witness spent two hours with defendant. The witness also testified that he remembered defendant's face and that he had no difficulty recognizing defendant. The court found that the witness testified credibly and, based on his testimony, determined that the identification by the witness was confirmatory (see People v Waterman, 56 AD3d 329, 329 [2008], lv denied 12 NY3d 763 [2009]). In view of the foregoing, we see no basis to disturb the court's ruling (see People v Morris, 165 AD3d 1489, 1491 [2018], lv denied 32 NY3d 1207 [2019]; People v Smith, 137 AD3d 1323, 1326-1327 [2016], lvs denied 28 NY3d 973, 974 [2016]; People v Heyliger, 126 AD3d 1117, 1119 [2015], lv denied 25 NY3d 1165 [2015]; People v Sanchez, 75 AD3d 911, 912-913 [2010], lv denied 15 NY3d 895 [2010]).
Defendant's argument that his right to counsel was violated because Allen was acting as an agent of law enforcement when defendant made admissions concerning the subject incident is without merit. The record discloses that Allen acted independently when he spoke with defendant and that the People were passive recipients of the information provided by Allen (see People v Burchard, 20 AD3d 818, 820 [2005], lv denied 5 NY3d 851 [2005]; People v Snickles, 206 AD2d 675, 676 [1994], lv denied 84 NY2d 872 [1994]). Furthermore, the fact that Allen had previously testified against other inmates in other cases did not make him an agent of law enforcement in this case (see People v Gibbs, 157 AD2d 799, 799 [1990], appeal dismissed 76 NY2d 851 [1990], lv dismissed 85 NY2d 1030 [1995]).
We reject defendant's contention that Supreme Court erred in permitting the People to rehabilitate a witness's credibility through evidence of a prior consistent statement (see People v Callicut, 101 AD3d at 1262-1263). Nor are we persuaded by defendant's contention that the court erred in admitting a sweatshirt into evidence, as well as the DNA evidence derived therefrom, due to deficiencies in the chain of custody (see People v Quinones, 191 AD2d 398, 400-401 [1993], lv denied 82 NY2d 758 [1993]). In any event, any claimed deficiencies in the chain of custody pertain to the weight to be accorded to such evidence and not its admissibility (see People v Fuller, 165 AD3d 1163, 1165 [2018], lv denied 32 NY3d 1204 [2019]; People v Jordan, 154 AD3d 1176, 1178 [2017]). Defendant's remaining contentions, to the extent not specifically discussed herein, have been considered and are without merit.
Garry, P.J., Mulvey and Rumsey, JJ., concur.




Aarons, J. (concurring).


I agree with the majority in almost all respects and diverge only with respect to the majority's reasoning of the merits of the issue of whether defendant's right to confrontation was violated. Notwithstanding this divergence, because the judgment should be affirmed, I respectfully concur.
Defendant argues that his right to confront witnesses was violated because the source code of the TrueAllele Casework System (hereinafter TrueAllele) was the declarant providing testimonial evidence against him and, by not having access to TrueAllele's source code, he was deprived of effective cross-examination. The majority answers the question of who the declarant is for the purposes of cross-examination. Although I agree that this question is certainly novel, it is unnecessary to resolve it at this juncture. In this regard, before determining whether the declarant to be confronted is Mark Perlin, TrueAllele's source code or a hybrid of the two, it is necessary, as a threshold matter, to assess whether defendant sufficiently requested disclosure of TrueAllele's source code in the first instance. In my view, defendant failed to do so.
The record discloses that defendant first demanded discovery of TrueAllele's source code in July 2014 in a supplemental discovery demand. The People, however, objected to defendant's request, and defendant took no further action to obtain the source code; defendant never sought a court order requiring disclosure of the source code or issued a subpoena to Cybergenetics seeking access to the source code [FN8]. Although defendant argued — in his motion to preclude any information derived from TrueAllele, or alternatively, for a hearing under Frye v United States (293 F 1013 [DC Cir 1923]) — that he could not verify TrueAllele's accuracy in the absence of the source code, he never asserted therein that the source code was required to be disclosed by the People. Indeed, the Frye hearing proceeded without the source code being disclosed and without any objection by defendant on such basis. Furthermore, defendant did not contend in his post-Frye hearing submission that the source code had to be disclosed.
Defendant ultimately submitted a trial motion in limine wherein he once again reiterated that he needed access to the source code in order to cross-examine Perlin about TrueAllele. He did not, however, seek to compel disclosure of the source code in this motion and, more critically, such motion was made after jury selection was completed and was dated five days after the first witness testified at trial. Given that the record fails to indicate any meaningful attempt by defendant to gain access to, or compel disclosure of, the source code prior to trial (see People v Fields, 160 AD3d 1116, 1120 [2018], lvs denied 31 NY3d 1116, 1120 [2018]; compare People v Easley, 171 AD3d 785, 786-787 [2019]; People v Robinson, 53 AD3d 63, 65 [2008], lv denied 11 NY3d 857 [2008]), there is no need to "address the intriguing possibilities had he done so" (People v Fields, 160 AD3d at 1120 n 3). It is for these reasons that I believe that defendant was not deprived of his confrontation rights.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: As we noted in a prior case, TrueAllele is "a computer program that subjects a DNA mixture to statistical modeling techniques to infer what DNA profiles contributed to the mixture and calculate the probability that DNA from a known individual contributed to it" (People v Fields, 160 AD3d 1116, 1118 [2018], lvs denied 31 NY3d 1116, 1120 [2018]).

Footnote 2: Perlin stated that a validation study assessed "the reliability of particular methods on a set of data."

Footnote 3: The source code is "the program's computer code in the original programming language as written by the software developers" (People v Fields, 160 AD3d at 1119 [internal quotation marks, brackets and citation omitted]). Specifically, Perlin explained at trial that "mathematical ideas get turned into a computer code that people can read called source code and then at a later point that source code is translated by computers into an object code which is machine readable." Perlin further testified that the source code described a function that the object code executed and that, after the object code is given the data, "the program runs and works on the data to produce answers."

Footnote 4: Perlin noted that terminology in the field regarding these systems can be somewhat vague.

Footnote 5:
Object code is "a computer program after translation from source code usually into machine language" by a computer programmer (Merriam-Webster Online Dictionary, object code [https://www.merriam-webster.com/dictionary/object%20code]).

Footnote 6: In Supreme Court, defendant's motion in limine exclusively asserted that the source code was the declarant and the failure to disclose it constituted a Confrontation Clause violation. To that end, cross-examining Perlin was discussed solely within the unique context at issue — assuming the source code is the declarant, it could not possibly be cross-examined without an intermediary, e.g., Perlin. While mindful that "[t]he Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him [or her], and the right to conduct cross-examination" (Pennsylvania v Ritchie, 480 US 39, 51 [1987]), defendant's alternative argument asserting that the failure to disclose the source code constitutionally impaired his right to adequately cross-examine Perlin as declarant was advanced only on appeal and is, therefore, unpreserved (see generally People v Tetreault, 152 AD3d 1081, 1082-1083 [2017], lv denied 30 NY3d 984 [2017]; People v Durham, 146 AD3d 1070, 1072 [2017], lv denied 29 NY3d 997 [2017]).

Footnote 7: Defendant raises a similar contention with respect to Allen, but he did not preserve it for our review (see People v Robinson, 160 AD3d 991, 991 [2018], lv denied 32 NY3d 1128 [2018]). In any event, it is similarly without merit.

Footnote 8: I express no opinion as to whether such avenues would have been successful had they been pursued.